UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

OLIVIA RUX, et. al.,

       Petitioners

v.

ABN-AMRO BANK, N.V., AMERICAN EXPRESS BANK, LTD., BANK OF NEW YORK, BANK OF CHINA, CITIBANK, N.A., DEUTSCHE BANK A.G., HSBC BANK USA, N.A, JPMORGAN CHASE BANK, N.A., BANK OF AMERICA, and FEDERAL RESERVE BANK OF NEW YORK

       Respondents.

Case No.: 1:08-cv-06588-AKH
(USDC E.D. Va. No. 2:04cv428)

Re: The Republic of Sudan,
Judgment Debtors

## PETITIONER'S MEMORANDUM IN SUPPORT OF PETITION FOR TURNOVER AGAINST THE FEDERAL RESERVE BANK OF NEW YORK

### I. INTRODUCTION

The Petitioner is the personal representative of each of the seventeen American sailors who perished onboard the U.S.S. Cole in Yemen as the result of an Al Qaeda terrorist attack on October 12, 2000. As a consequence of the Republic of Sudan's participation in the development of Al Qaeda and its material support leading to this terrorist event, on October 11, 2007, the United States District Court for the Eastern District of Virginia entered a final judgment for Petitioner and against the Republic of Sudan in the amount of $12,275,860.00.[1]

The Petitioner filed this turnover proceeding against the Federal Reserve Bank of New York because it holds a blocked account for the Bank of Khartoum in the amount of $2,115,471.11. The account was held by the Bank of Khartoum in its capacity as Sudan's "central bank."

---

[1] The Republic of Sudan had been designated as a state sponsor of terrorism prior to October 12, 2000.

Before the passage of the Terrorism Risk Insurance Act of 2002, execution on this account would have been exempted by 28 U.S.C.A 1611(b) of the Foreign Sovereign Immunities Act ("FSIA"). As will be discussed below, the Terrorism Risk Insurance Act ("TRIA") stripped Sudan of this exemption as to victims of terrorism.

## II. THE TRIA WAS PASSED TO ELIMINATE ALL BARRIERS TO PAYMENT OF § 1605(A)(7) JUDGMENTS AGAINST STATE SPONSORS OF TERRORISM

### A. The History of the FSIA Relative to Terrorism

On February 26, 1996, President Clinton requested legislation to provide relief to the families of four Cuban Americans that were killed when the Cuban Air Force shot down two aircraft over the Straits of Florida. The victims of this extrajudicial killing were, at the time of their deaths, engaged in humanitarian efforts to locate Cuban rafters escaping their island to avoid the tyranny of the Castro regime. President Clinton stated:

> "I am asking that Congress pass legislation that will provide immediate compensation to the families, something that they are entitled to under international law, out of Cuba's blocked assets here in the United States. If Congress passes this legislation, we can provide the compensation immediately.

See Flatow v. Islamic Republic of Iran, 74 F. Supp. 2d 18, 25 n.4 (emphasis added).

In response to this request, Congress passed the Antiterrorism and Effective Death Penalty Act of 1996 on April 24, 1996. This act amended the FSIA to provide redress to victims of terrorism for acts of terrorism by rogue states. Public Law 104-132, 1996 S 735, 110 Stat. 1124. President Clinton confirmed this intent on the signing of the bill. See Flatow, 74 F. Supp. 2d at 25 n.4. The 1996 to the FSIA amendment was silent, however, as to the ability to execute on assets of state sponsors of terrorism.

In October 1998, Congress amended the Foreign Sovereign Immunities Act to provide for execution on assets of state sponsors of terrorism. Congress provided that:

> Notwithstanding any other provision of law, including but not limited to section 208(f) of the Foreign Missions Act (22 U.S.C. 4308(f)), and except as provided in subparagraph (B), any property with respect to which financial transactions are prohibited or regulated pursuant to section 5(b) of the Trading with the Enemy Act (50 U.S.C. App. 5(b)), section 620(a) of the Foreign Assistance Act of 1961 (22 U.S.C. §2370(a)), sections 202 and 203 of the International Emergency Economic Powers Act (50 U.S.C. 1201-1702), or any other proclamation, order, regulation, or license issued pursuant thereto, shall be subject to execution or attachment in aid of execution of any judgment relating to a claim for which a foreign state (including any agency or instrumentality of such state) claiming such property is not immune under section 1605(a)(7).

28 U.S.C. §1610(f)(1)(A)(emphasis added).

This process still provided the President with waiver power allowing assets to remain blocked in the interest of national security.

Immediately upon signing this amendment in 1998, President Clinton exercised the waiver power and continued to block assets. In Flatow v. Iran, 76 F. Supp. 2d 16 (D.D.C. 1999), The Court, relying on President Clinton's 1998 Executive Order issued pursuant to §117(d) of the Omnibus Consolidated and Emergency Appropriations Act, declared that the efforts to collect against certain foreign assets were blocked and would remain so until further action was taken.

On October 28, 2000, Congress responded to the problem of the waiver by enacting the Victims of Trafficking and Violence Protection Act of 2000. Pub. L. 106-386, 2000 H.R. 3244, 114 Stat 1464. Section 2002 provided for payment of certain specific anti-terrorism judgments and expressly repealed subsection 117 (d) of the 1998 Act. The waiver power was replaced with a waiver provision that was to be used only on a limited case by case basis.

Notwithstanding the legislative history regarding the passage of the 2000 amendment, which clearly stated Congress' intent that the waiver be applied in a limited, case by case basis, President Clinton reissued a blanket waiver on October 28, 2000, the same day the bill became law. Other than a limited group of plaintiffs who recovered judgments against Iran and Cuba, judgments remained unpaid.

Congress, recognizing the plight of victims of state sponsors of terrorism, revisited the issue again in 2002 and passed the Terrorism Risk Insurance Act of 2002. This act was intended to assure that all issues regarding the right to execute on judgments by victims of terrorism were resolved and to assure that these victims were paid. Thus, after having its intent frustrated following the 1998 and 2000 Amendments to the FSIA, Congress provided clearly that victims of terrorism were to be paid from funds belonging to state sponsors of terrorism, including their agencies and instrumentalities, and further stripped away all exemptions from execution.

### B. The Terrorism Risk Insurance Act Preempts All Other Provisions of Law

The TRIA controls over all other laws, including any alleged limited asset immunity of the central bank or presumptions of separate juridical status. Congress, by the use of language "[n]otwithstanding any other provision of law," caused the TRIA to preempt all other laws regarding blocked assets, including the limited asset immunity protection for the central bank of Sudan, as provided by §1611.

*The Statutory Language.* Section 201(a) of the TRIA was enacted by Congress to provide a means through which judgments entered against terrorist parties can be enforced. To accomplish this result, Congress used language that could hardly be clearer:

> *Notwithstanding any other provision of law*, and except as provided in subsection (b), in every case in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism, or for which a terrorist party is not immune

under section 1605(a)(7) of title 28, United States Code, <u>the blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment in aid of execution</u> in order to satisfy such judgment to the extent of any compensatory damages for which such terrorist party has been adjudged liable.

P.L. 107-297, Title II, § 201(a), Nov. 26, 2002, 116 Stat. 2322 (emphasis added).

The TRIA specified that all assets of a terrorist state "shall be subject to execution or attachment in aid of execution" in order to satisfy a judgment (including the blocked assets of any agency or instrumentality of that terrorist [state]. The only exemption that remained after the TRIA was passed was when there has been a specific determination that an asset should not be executed against because of our national security interest. 28 U.S.C.A. 1610(b). That limited exception does not apply.

      C.      **Proper Statutory Interpretation Requires a Finding That Any Central Bank Exemption Was Stripped by the TRIA**

Section 201 of the TRIA controls over any exemption provided by Section 1611 of the FSIA. Courts have repeatedly held that the phrase "notwithstanding any other provision of law" (or variations thereof) conveys an unambiguous legislative intent that the new law supercedes all previous laws. *See* United States v. Fernandez, 887 F. 2d 465 (4th Cir. 1989). Where Congress enacts a statute declaring that it applies "notwithstanding any other provision of law," Congress is cognizant of the laws that were previously in effect and a more clear statement of Congress' intent that the new law supercedes the previous ones "is difficult to imagine." *See* Crowley Caribbean Transport, Inc. v. United States, 865 F. 2d 1281 (D.C. Cir. 1989). Mapoy v. Carroll, 185 F. 3d 224, 229 (4th Cir. 1999)(a statute which applies "notwithstanding any other provision of law" means that all other contrary statutes governing that subject are of no effect); New Jersey Air National Guard v. Federal Labor Relations Authority, 677 F. 2d 276, 283 (3rd Cir. 1982):

> Looking first at the statutory language, we immediately confront the preface to section 709(e) of the Technician Act, which explicitly provides that its terms apply "Notwithstanding any other provision of law..." A clearer statement is difficult to imagine: section 709(e) must be read to override **any** conflicting provision of law in existence at the time that the Technician Act was enacted. (emphasis added).

Energy Transportation Group, Inc. v. Skinner, 752 F. Supp. 1, 10 (D.D.C. 1990):

> ...the Court of Appeals has frequently held that the phrase "notwithstanding any other provision of law," or a variation thereof, means exactly that; it is unambiguous and effectively supercedes all previous laws. (emphasis added).

Congress intended to preempt the §1611 as to central banks of state sponsors of terrorism because an exemption does not exist under the TRIA. Section 1611 came into law before the 1996 amendment to the FSIA created jurisdiction for claims by victims of terrorism against state sponsors of terrorism. The Congressional intent in enacting the central bank exemption under Section 1611 was to avoid the discouragement of investment of foreign funds in the U.S. and foreign relations problems if execution were permitted. *See* Weston Compagnie de Finance et D'Investissement, S.A. v. La Republica Del Ecuador, 823 F. Supp. 1106 (S.D.N.Y. 1993). This policy is inapplicable to state sponsors of terrorism. Their assets are blocked and their investments are frozen.

If the Court were to adopt Respondents' argument and decide that Petitioners cannot execute against the assets of Sudan's central bank, this Court would be rewriting the language of Section 201 to add the central bank's assets to the only exemption permitted under the TRIA. The Court cannot rewrite a law because to do so would violate the plain meaning rule and would vitiate the unambiguous intent of Congress in providing that victims of state sponsors of terrorism can execute against the assets of the state's agencies and instrumentalities, including the central bank. *See* In re Stoltz, 2002 WL 31845886, *6 (2nd Cir. 2002)(courts must begin

statutory interpretation with the understanding that Congress says in a law what it means and means in a law what it says); In re Edelman, 295 F. 3d 171, 177 (2nd Cir. 2002)(where statutory terms are clear the court's inquiry into their meaning is at an end); In re Venture Mortgage Fund, 282 F. 3d 185, 188 (2nd Cir. 2002)("It is axiomatic that the plain meaning of a statute controls its interpretation, and that judicial review must end at the statute's unambiguous terms"); Connolly v. Bidermann Industries U.S.A., Inc., 56 F. Supp. 2d 360, 365 (S.D.N.Y. 1999); B.N. Realty Associates v. Lichtenstein, 238 B.R. 249, 254 (S.D.N.Y. 1999)(the plain meaning rule presumes that Congressional intent is captured in the language of the statute and that the sole function of the courts is to enforce it according to its terms).

Accordingly, based upon the unambiguous and broad language of Section 201 of the TRIA the judgment on the plaintiff's claim against Sudan under the state-sponsored terrorism exception of the Foreign Sovereign Immunities Act (the "FSIA"), 28 U.S.C. §1605(a)(7) can be enforced against the blocked assets of an agency or instrumentality of Sudan, which includes the Sudan's central bank. Any other suggestion must be rejected as a violation of the cardinal rule of statutory construction that statutes must be construed, if at all possible, to give all of their provisions meaning and "operative effect." United States v. Nordic Village, 503 U.S. 30, 36 (1992); see also Duncan v. Walker, 533 U.S. 167, 174 (2001) ("It is our duty 'to give effect, if possible, to every clause and word of a statute.'"); Connecticut Nat'l Bank v. Germain, 503 U.S. 249, 253 ("courts should disfavor interpretations of statutes that render language superfluous").

IV. **Other Courts Have Held that Assets Which May Be Immune From Execution and Attachment Under the Foreign Sovereign Immunities Act are Not Immune When Attached Under the Terrorism Risk Insurance Act**

The first case to analyze the relationship between the FSIA and the TRIA was Hill v. Republic of Iraq, 2003 WL 21057173 (D.D.C. 2003). In Hill, Plaintiffs obtained a judgment

against the Republic of Iraq resulting from acts of hostage taking and false imprisonment following the Iraqi invasion of Kuwait in 1990. The Plaintiffs sought to satisfy a portion of that judgment from funds held by Riggs Bank, N.A. in the "Embassy of Iraq Commercial Office, Central Bank Account." Id, at fn. 1. Those funds were within the ambit of the Vienna Convention excepting diplomatic funds. In analyzing the Plaintiffs' claim, the Court acknowledged that

> it is conceivable that [the Iraq Embassy Account] might be entitled to immunity under the provisions of the Vienna Convention on Diplomatic Relations, Apr. 18, 1961, 23 U.S.T. 3227, or the FSIA, 28 U.S.C. §§ 1609-1610, *were plaintiffs not proceeding under the TRIA. However, this Court need not reach that issue because the question whether and under what circumstances plaintiffs are entitled to execute against the Iraqi accounts is governed not by the provisions of the Vienna Convention or the FSIA, but by the TRIA.*[2]

Id. (emphasis added)(internal citations omitted). The Court based its opinion on the specific language of the TRIA which provides "'[n]otwithstanding any other provision of law', the blocked assets of a terrorist party 'shall be subject to execution or attachment in aid of execution.'" Id. That phrase "unambiguously and effectively supersedes all previous laws." Id. *citing* Energy Transp. Group, Inc. v. Skinner, 752 F.Supp. 1, 10 (D.D.C. 1990). The Court held:

> *Accordingly, by its plain terms, the TRIA overrides any immunity from execution that blocked Iraqi property might otherwise enjoy under the Vienna Convention or the FSIA. Indeed any contrary construction would frustrate the statutory objective of ensuring that judgments rendered against terrorist states based upon terrorist acts 'are to be enforced.'*

---

[2] The Petitioners entered a stipulation with JP Morgan Chase Bank, N.A. that a Sudan Embassy Account would be exempt from these turnover proceedings. However, based upon the holding in Hill, the Petitioners reserve the right to execute against those funds should the judgment remain unsatisfied at the conclusion of these proceedings.

{8331\00089497.2}
HALL, LAMB AND HALL, P.A., PENTHOUSE ONE, 2665 S. BAYSHORE DRIVE, MIAMI, FLORIDA 33133 • TEL. (305) 374-5030 • FAX (305) 374-5033

8

Id. (emphasis added) *citing* 148 Cong. Rec. H8728 (Nov. 13, 2002) (conference report; *see also* 148 Cong. Rec. S11525 (Nov. 19, 2002) (remarks of Sen. Harkin) ("Title II operates to strip a terrorist state of its immunity from execution or attachment in aid of execution.").

The Southern District of New York also analyzed the relationship between the TRIA and FSIA in Weininger v. Castro, 462 F.Supp.2d 457 (S.D.N.Y. 2006). In Weininger, two victims of the Cuban government sued Cuba and others in Florida Courts under 28 U.S.C. § 1605(a)(7). Default judgments were entered. Later, enforcement of the Judgment was sought in this Court. Writs of garnishment were served on the banks. The Plaintiffs then sought to attach the blocked assets of Banco Nacional held by JP Morgan Chase. The Court acknowledged that Banco Nacional "is apparently the central bank of the Republic of Cuba." Id. at 497. In analyzing whether the FSIA exemption for execution of central bank property continued after the passage of the TRIA when executing against a terrorist party, the Court held:

> Section 1611(b) in turn states that a foreign central bank's property is immune "[n]otwithstanding the provisions of 1610." Notably, § 1611(b) lists certain exceptions to this immunity-such as waiver- that are found in § 1610(a), but it does not list exceptions based on terrorism. Plaintiffs argue that § 1611(b) presents no impediment to execution because TRIA § 201(a)'s provisions apply 'notwithstanding any other provisions of law.' TRIA § 201(a), codified at §1610. *As previously noted, the intent of the 'notwithstanding' language in TRIA is "to target statutory exceptions to immunity," and "to the extent that a foreign country's sovereign immunity potential conflicts with Section 201(a), the 'notwithstanding' phrase removes the potential conflict." Accordingly, TRIA, which was enacted later in time than § 1611, overrides the immunity conferred in § 1611.*

Id. at 498-499 (emphasis added) *(internal citations omitted)*.

In reaching its decision, the Weininger Court relied upon Smith v. Federal Reserve Bank of New York, 280 F.Supp.2d 314 (S.D.N.Y. 2003). In Smith, the Plaintiffs sought to attach blocked assets of the Republic of Iraq which had previously been confiscated by President Bush

under a Presidential Executive Order and the International Emergency Economic Powers Act (IEEPA), as amended by the Patriot Act. These assets were also held by the Federal Reserve Bank of New York.

In moving to enjoin disbursement of those assets by the New York Fed under the President's order of confiscation, the Plaintiff's argued that the phraseology "notwithstanding any other provisions of law" acted to supersede the Presidential Order and the IEEPA as it did in Hill, *supra*. The Court recognized that the phrase "notwithstanding any other provision of law" contained in the TRIA was controlling regarding execution on assets. However, the Court further concluded that the TRIA did not strip the President of the United States of the power to confiscate blocked assets when the Unites States had been attacked. Once that confiscation occurred, the assets were no longer available for execution and such confiscation was not prohibited because this was no execution against such assets at the time of confiscation. Id. at 319.

The Second Circuit affirmed the Southern District of New York's decision in Smith v. Federal Reserve Bank of New York, 346 F.3d 264 (2d Cir. 2003). The Court accepted that the TRIA controlled unless the President had already confiscated funds under the Patriot Act's Amendment to the Emergency Powers Act. However, the confiscation power is inapplicable to Sudan because no confiscation has occurred.

Petitioner seeks to attach *blocked assets* of Sudan which is governed by the TRIA. The ruling by the Court in Smith only resulted because at the time of attachment, the assets were already confiscated and were no longer "blocked." Id. In doing so, the Second Circuit approved the analysis of Hill, *supra*, which held that the TRIA's "notwithstanding" phrase acts to

supersede the immunity from attachment of "blocked assets" set forth in the FSIA. Smith, 346 F.3d at 271.

## V. CONCLUSION

Based upon the accepted analysis governing the relationship of the FSIA and the TRIA, the immunity afforded by the FSIA is superseded by the TRIA. As such, the funds held by the New York Fed are subject to attachment and should be turned over to the Petitioners forthwith.

Respectfully submitted,

HALL, LAMB AND HALL, P.A.
*Attorneys for Petitioners*
2665 S. Bayshore Drive,
Penthouse One
Miami, Florida 33133
Telephone:  (305) 374-5030
Facsimile:  (305) 374-5033

By: _____
ANDREW C. HALL
F.B.N. 111480

TO:    Republic of Sudan (By certified mail, return receipt requested)
c/o Embassy of the Republic of Sudan
2210 Massachusetts Avenue
Washington, DC 20008

Republic of Sudan (By certified mail, return receipt requested)
c/o UN Mission of the Republic of Sudan
305 East 47th Street, 4th Floor
New York, NY 100017

Gregory N. Stillman and Carl D. Gray (By certified mail, return receipt requested)
Hunton & Williams LLP
500 East Main Street, Suite 1000
Norfolk, Virginia 23510
*Attorneys for the Republic of Sudan*

David Jones (By certified mail, return receipt requested)
AUSA-SDNY
86 Chambers Street
Third Floor
New York, New York 10007
*Attorneys for OFAC*

The following via CM/ECF Electronic Filing System:

Barry Jay Glickman bglickman@zeklaw.com

Sharon L. Schneier sharonschneier@dwt.com

Mark Putnam Gimbel mgimbel@cov.com, courtclerksny@cov.com

Shari Debra Leventhal Shari.Leventhal@ny.frb.org,

Kristin.sturm@ny.frb.org, stephanie.ruiz@ny.frb.org

Paul Kenneth Stecker PStecker@phillipslytle.com

Michael J. Bauer mbauer@llf-law.com

Howard B. Levi hlevi@llf-law.com

Christina Bost-Seaton christina.bost-seaton@troutmansanders.com

Danielle Sandra Friedberg dfriedberg@mosessinger.com

AFFIDAVIT OF SERVICE

STATE OF NEW YORK    )
                            ss.:
COUNTY OF NEW YORK  )

DONALD THORESEN, being duly sworn, deposes and says:

I am not a party to this proceeding, am over eighteen years of age, and reside in Kings County, State of New York.

On August 27, 2008, I served Petitioner's Memorandum in Support of Petition for Turnover Against the Federal Reserve Bank of New York upon:

> Republic of Sudan
> c/o Embassy of the Republic of Sudan
> 2210 Massachusetts Avenue
> Washington, D.C. 20008
>     -and-
> Republic of Sudan
> c/o UN Mission of the Republic of Sudan
> 305 East 47th Street, 4th Fl.
> New York, NY 10017
>     -and-
> Gregory N. Stillman, Esq.
> Carl D. Gray, Esq.
> Hunton & Williams LLP
> 500 East Main Street, Suite 1000
> Norfolk, Virginia 23510
>     -and-
> David Jones, Esq.
> AUSA-SDNY
> 86 Chambers Street
> Third Floor
> New York, New York 10007

by Certified mail, Return Receipt Requested, by placing true copies of same in properly-addressed, securely-sealed envelopes and by causing said envelopes to be placed within

the custody and control of the United States Postal Service for mailing by Certified Mail, Return Receipt Requested.

_____
Donald Thoresen

Sworn to before me this
27th day of August, 2008.

_____
Notary Public

ROSEMARY SETTEDUCATO
Notary Public, State of New York
No. 24-4678133
Qualified in New York County
Commission Expires Dec 31, 20__