UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

OLIVIA RUX *et al.*,

        Petitioners,

        v.

ABN AMRO BANK N.V., *et al.*,

        Respondents.

08 Civ. 6588 (AKH)


## STATEMENT OF INTEREST OF THE UNITED STATES OF AMERICA


MICHAEL J. GARCIA
United States Attorney for the
Southern District of New York
Attorneys for United States of America
86 Chambers Street, 5th Floor
New York, New York 10007
Tel.: (212) 637-2739/2716


DAVID S. JONES
JOHN D. CLOPPER
Assistant United States Attorney
—Of Counsel—

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................1

BACKGROUND .................................................................................................................2

A.     Applicable Statutory and Regulatory Scheme .......................................................2

B.     Procedural History .................................................................................................7

DISCUSSION ....................................................................................................................9

A.     The Assets That May Be Subject to Execution Under TRIA Are Only a
        Subset of the Property Subject to Blocking Under the SSR ...............................9

B.     Any Assets Not Found Eligible for Execution Remain Blocked Under the
        Sudan Sanctions, and Must Be Returned to the Banks From Which the
        Funds Came ........................................................................................................12

CONCLUSION..................................................................................................................13

## PRELIMINARY STATEMENT

The United States of America (the "United States" or the "Government"), by and through its counsel, Michael J. Garcia, United States Attorney for the Southern District of New York, respectfully submits this Statement of Interest pursuant to 28 U.S.C. § 517.[1]

The primary purpose of this Statement is to address important and sensitive questions raised by this case about the interaction between the U.S. economic sanctions programs and a statute authorizing victims of state-sponsored terrorism to recover from blocked funds of the state sponsor of terrorism in certain circumstances. The Statement also provides information that may assist the Court in its determination of ownership of the assets at issue.

Economic sanctions are an essential tool for the protection of national security and the conduct of foreign policy. It is therefore in the interest of the United States that the blocked funds at issue in this matter are released only to the extent that they satisfy Petitioners' statutory entitlements. The Court's adjudication should not provide other potential litigants with an opportunity to bring a collateral challenge to the Department of Treasury's Office of Foreign Assets Control ("OFAC") blocking regime and blocked asset determinations. If, pursuant to Terrorism Risk Insurance Act ("TRIA"), Pub. L. No. 107-297, Title II, § 201 (Nov. 26, 2002), which applies only to blocked funds, the Court finds that certain funds at issue are attachable by Petitioners, the Court may transfer those funds to Petitioners pursuant to applicable attachment procedures. If the Court concludes that certain assets are not attachable by Petitioners, these assets should be returned to their original accounts.

---

[1] That statute provides: "The Solicitor General, or any officer of the Department of Justice, may be sent by the Attorney General to any State or district in the United States to attend to the interests of the United States in a suit pending in a court of the United States. . . ." 28 U.S.C. § 517.

As explained below, TRIA applies only to a subset of those assets that are blocked (*i.e.*, only to those that are "of that terrorist party").  In contrast, the blocking regulations apply more expansively to all funds in which the Government of Sudan has a broadly defined "property interest," including merely subordinate or contingent interests.  Thus, it is likely that some of the blocked funds in the Court's registry are not eligible under TRIA (or other applicable law) for satisfaction of Petitioners' judgment against Sudan.  Such ineligible funds will remain subject to the Sudanese Sanctions Regulations ("SSR").  Accordingly, after the Court determines which assets are not subject to attachment and execution by Petitioners, such funds should be returned to the bank or banks from which they were transferred to the Court.  To facilitate the prompt return of those funds through the financial system, OFAC is available to issue an appropriate license.

## BACKGROUND

A.    Applicable Statutory and Regulatory Scheme

This case involves the Petitioners' attempt to enforce a judgment, obtained against the Government of Sudan, by attaching assets owned by the Government of Sudan and in the possession of the Respondent banks.  Attachment of a foreign state's property in the United States is governed by the Foreign Sovereign Immunities Act of 1976 ("FSIA"), 28 U.S.C. §§ 1330, 1602-1611.  *See Karaha Bodas Company, LLC v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 313 F.3d 70, 82 (2d Cir. 2002) (discussing attachment of foreign sovereign's property).  The FSIA establishes that, with certain exceptions, property of a foreign state is immune from execution in satisfaction of a judgment.  Section 1609 of the FSIA provides that "the property in the United States of a foreign state shall be immune from attachment arrest

2

and execution except as provided in sections 1610 and 1611 of [the FSIA]." 28 U.S.C. § 1609.

Section 1610, in turn, creates certain exceptions to the immunity from attachment and execution

otherwise conferred by section 1609 (such as, for example, the exemption from immunity for

property of foreign states "used for a commercial activity in the United States," *see* 28 U.S.C.

§ 1610(a)). The FSIA further provides that when a foreign state is not protected by sovereign

immunity, "the foreign state shall be liable in the same manner and to the same extent as a

private individual under like circumstances." 28 U.S.C. § 1606; *see Karaha Bodas Company,*

*LLC*, 313 F.3d at 83 (applying this provision to attachment proceedings).

TRIA – which is codified as a note to Section 1610 – creates an exception to the

immunity of a foreign state's assets for the blocked assets of foreign state sponsors of terrorism

under certain circumstances. In relevant part, TRIA Section 201(a) provides:

> Notwithstanding any other provision of law, . . . in every case is which a person
> has obtained a judgment against a terrorist party on a claim based upon an act of
> terrorism, or for which a terrorist party is not immune under section 1605(a)(7) of
> title 28, United States Code, *the blocked assets of that terrorist party (including*
> *the blocked assets of any agency or instrumentality of that terrorist party) shall*
> *be subject to execution or attachment in aid of execution in order to satisfy such*
> *judgment* to the extent of any compensatory damages for which such terrorist
> party has been adjudged liable.

TRIA § 201(a) (emphasis added), Pub. L. No. 107-297, Title II, § 201 (Nov. 26, 2002), codified

at 28 U.S.C. § 1610 note. Thus, TRIA creates a limited exception to the immunity from

attachment and execution afforded by the FSIA where the assets of the foreign state constitute

the "blocked assets of [a] terrorist party." TRIA also makes those assets potentially eligible for

attachment by judgment-creditors notwithstanding the blocking regulations described below. *Id.*

TRIA Section 201(d)(2) defines "blocked asset" as, with exceptions not pertinent here,

"any asset seized or frozen by the United States under section 5(b) of the Trading With the

3

Enemy Act or under sections 202 and 203 of the International Emergency Economic Powers Act[.]"  TRIA Section 201(d)(4) defines "terrorist party" as "a terrorist, a terrorist organization (as defined in section 212(a)(3)(B)(vi) of the Immigration and Nationality Act (8 U.S.C. § 1182(a)(3)(B)(vi))), *or a foreign state designated as a state sponsor of terrorism under section 6(j) of the Export Administration Act of 1979* (50 U.S.C. App. 2405(j)) or section 620A of the Foreign Assistance Act of 1961 (22 U.S.C. § 2371)" (emphasis added).

Sudan has been designated a state sponsor of terrorism under section 6(j) of the Export Administration Act ("EAA") of 1979.  *See* 58 Fed. Reg. 52,523 (Oct. 8, 1993) (Secretary of State designation stating, "In accordance with section 6(j) of the [EAA], I hereby determine that Sudan is a country which has repeatedly provided support for acts of international terrorism."); *see also Owens v. Republic of Sudan*, 531 F.3d 884, 888 (D.C. Cir. 2008) (noting designation of Sudan under section 6(j) of the EAA.  Notwithstanding the immunity otherwise extended to a foreign state's assets by the FSIA, under TRIA, the blocked assets "of" Sudan are therefore not immune from attachment and execution.

As Congress recognized in enacting TRIA, the United States has blocked a wide range of assets related to – but not necessarily owned by – the Government of Sudan.  The United States' actions in blocking this broad class of assets is authorized by the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701, *et seq.*[2]  *See Holy Land Foundation for Relief and Development v. Ashcroft*, 333 F.3d 156, 162-63 (D.C. Cir. 2003) (holding that IEEPA

---

[2]  IEEPA authorizes the President, in times of national emergency originating in whole or substantial part outside the United States as declared by the President pursuant to 50 U.S.C. § 1701, to "investigate, . . . regulate, direct and compel, nullify, void, prevent or prohibit, any . . . transfer, withdrawal . . . or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has

permits blocking of more than "traditional legal interests"); *Global Relief Foundation v. O'Neill*, 315 F.3d 748, 753 (7th Cir. 2002) (same).  Pursuant to IEEPA, in November 1997, the President declared a national emergency with respect to Sudan, finding that the policies and actions of the Government of Sudan, including continued support for international terrorism, ongoing efforts to destabilize neighboring governments, and the prevalence of human rights violations, including slavery and the denial of religious freedom, constituted an unusual and extraordinary threat to the national security and foreign policy of the United States.  *See* Exec. Order No. 13067, 62 Fed. Reg. 59989 (Nov. 3, 1997).  In turn, the Department of the Treasury promulgated the SSR, published at 31 C.F.R. Part 538, which include a trade embargo and economic freeze on all property in which the Government of Sudan has an interest.  OFAC is responsible for administering the SSR and other economic sanctions programs promulgated pursuant to IEEPA. *See* Declaration of John E. Smith, dated November 21, 2008 ("Smith Decl."), ¶¶ 3-4 (annexed hereto).

In relevant part, the SSR block all property within the United States or in the possession or control of a U.S. person in which the Government of Sudan has an interest.  *See* 31 C.F.R. §§ 538.201, 538.301.  In defining what constitutes a blockable interest, the SSR cast a very broad net.  The SSR define "property" and "property interest" to include, *inter alia*, ". . . any other property, real, personal, or mixed, tangible or intangible, or interest or interests therein, present, future, or contingent."  31 C.F.R. § 538.310; *see also id.* § 538.307 (defining "interest" in property as "an interest of any nature whatsoever, direct or indirect").

Because the definitions of "property" and "property interest" are so broad and include,

---

any interest . . . ."  50 U.S.C. § 1702.

for example, interests "of any nature whatsoever, direct or indirect," *see* C.F.R. § 538.307, and property interests "present, future or contingent," *see* C.F.R. § 538.310, a relatively minor and subordinate interest in property of the Government of Sudan can require that an asset be blocked pursuant to the SSR, even where one or more parties unrelated to the Government of Sudan have superior ownership interests in that asset. *See* Smith Decl. ¶ 12; *see also Holy Land Foundation for Relief and Development v. Ashcroft*, 333 F.3d at 162-63; *Global Relief Foundation v. O'Neill*, 315 F.3d at 753.  In this case, for example, a number of wire transfers have been blocked pursuant to the SSR because the Government of Sudan, as defined in the SSR, had some "interest," "direct or indirect," "present, future or contingent," in the property that was the subject of the transactions. *See* 38 C.F.R. §§ 538.305, 538.307, 538.310; Smith Decl. ¶¶ 14-15.

Two recent applications to OFAC to unblock assets currently blocked under the SSR are illustrative of the breadth of the SSR's application. *See* Smith Decl. ¶ 14.  Both applications relate to wire transfers consisting of non-commercial personal remittances by persons not subject to sanctions being sent to accounts held at a bank owned by the Government of Sudan.[3]  *See id.* The Government of Sudan, through a bank that it owns, does have what OFAC considers to be blockable interests in the transfers. *See id.* The funds are therefore blocked property.[4]  In various other legal contexts, however, Sudan's interests in these funds likely would not be considered ownership interests.  For example, such funds likely would not qualify as property owned by the Government of Sudan under state law. *See, e.g.,* N.Y. Uniform Commercial Code

---

[3]  On information and belief, we understand that these blocked assets are not currently held in the Court's registry.

[4]  Notwithstanding their respective ownership interests, the individuals who assert primary ownership in the funds may obtain the funds' release only by applying to OFAC for a license pursuant to 31 C.F.R. § 538.500 *et seq*. *See* Smith Decl. ¶¶ 17-19.

§ 4-A-404 (McKinney 2008) ("[I]f a beneficiary's bank accepts a payment order, the bank is obliged to pay the amount of the order to the beneficiary of the order."); § 4-A-302 (describing obligation of intermediary bank to follow instructions given to it by the sender of a payment order). Many other wire transfers or other funds properly blocked under the SSR may be similar.

B.      Procedural History

        In this case, Petitioners hold a judgment from the United States District Court for the Eastern District of Virginia against the Government of Sudan arising from its role in the terrorist bombing of the U.S.S. Cole. *See Rux v. Republic of Sudan*, No. 2:04cv428 (E.D. Va.) (amended judgment filed Nov. 16, 2007). In November 2007, Petitioners sought to collect on their judgment from banks that, when this proceeding was commenced, held funds that were blocked under the SSR. Plaintiffs initially proceeded by serving writs of attachment against the Respondent banks in the Southern District of New York. The Respondent banks sought relief from this Court, opposing the writs of attachment pending clarification of the actual ownership of funds they hold.

        As part of their post-judgment proceedings, Petitioners also issued a third-party subpoena to OFAC, requesting a list of all Sudanese-related blocked assets. On April 14, 2008, OFAC provided the Petitioners with such a list, pursuant to a protective order issued in the United States District Court for the Eastern District of Virginia. *See* Smith Decl. ¶ 16. The list included information about the dollar values and locations of the assets, and also included a field labeled "owner." *See id.* In providing this list, however, OFAC made clear to the Petitioners that the "owner" information being provided was simply what the current holders of the blocked assets (*i.e.*, the financial institutions) had reported to OFAC as the "owner" of those assets for administrative purposes. *See id.* ¶¶ 13, 16. When providing the information, OFAC further

informed Petitioners that the "owner" field does not reflect a determination regarding legal title to the assets, or whether such assets may be attachable by Petitioners. *See id.* Indeed, OFAC understands that the information in the "owner" field does not evidence actual ownership of the funds at issue, but rather generally is used by the holders of blocked assets (*i.e.*, reporting financial institutions) for their own clerical purposes, perhaps merely to indicate the sanctions program under which the assets were blocked or the reason that the assets were blocked, and not indicating any opinion or determination of actual ownership. *See id.* Thus, for example, in the case of wire transfers, the "owner" field may reflect the name of the Sudanese bank that was processing the wire transfer, although that bank does not hold legal title to the underlying funds that were blocked pursuant to the SSR. *See id.* ¶¶ 12, 16.

On July 29, 2008, this Court entered an order (the "July 29 Order") imposing deadlines for notifying parties with an interest in the funds held by the Respondent banks, which Petitioners sought to attach, and for those parties to inform the Court if they objected to Petitioners' claim to those funds. In addition, the July 29 Order required that the "contested funds" be transferred to the Court registry pending resolution of the matter. Certain modifications to the original schedule have since been imposed. On August 22, 2008, the Department of Justice sent a letter to the Court explaining the blocked status of the contested assets and requesting that the Court modify its order to remove the requirement that Respondent banks transfer certain funds to the Court registry. The Court denied this request, and the subject funds have now been transferred to the Court's registry. We understand that the Respondent banks have sent notices as contemplated by the July 29 Order. Claimants' responses are due in late November 2008, at which time the Court will schedule such further proceedings as are warranted, presumably ultimately determining which assets held by the Respondent banks are

8

the blocked assets "of" the Government of Sudan and, therefore, pursuant to TRIA, subject to
execution.

## **DISCUSSION**

A. The Assets That May Be Subject to Execution Under TRIA Are Only a Subset of the
   Property Subject to Blocking Under the SSR

For purposes of this case, the United States concurs with what appears to be the view of
all involved parties:  that once the Court determines that TRIA removes the FSIA immunity from
attachment of an asset and that the Petitioners are entitled to turnover of that asset, the asset may
be transferred to the Petitioners without a license from OFAC.[5]  Thus, this Court's determination
that, pursuant to TRIA, specific funds are not immune from execution and are attachable by
Petitioners will be sufficient for those funds to be transferred to Petitioners without any action by
OFAC.[6]

The Government wishes to share the following observations that may assist the Court in
its determination of whether assets are in fact owned by the Government of Sudan – or in the
words of TRIA, are assets "of that terrorist party."[7]  Specifically, determinations of such
ownership should not be based merely on the "owner" information contained in the list of
blocked assets which OFAC provided to Petitioners or based on the absence of a response to the
Court's notice to interested parties.  *See supra* at 8.  As previously explained, the entry of

---

[5]  Because TRIA Section 201(a) provides, notwithstanding any other provision of law,
that certain blocked assets are subject to execution or attachment, it overrides the SSR's
restrictions on transactions with such blocked assets.

[6]  The Government notes that TRIA does not deprive the President of authority to vest
certain blocked assets pursuant to IEEPA.  *See Smith v. Federal Reserve Bank of New York*, 280
F. Supp. 2d 314, 319-20 (S.D.N.Y. 2003).  This issue, however, is not presently before the Court.

[7]  This Statement takes no position with respect to the evidentiary standards governing

"Sudan" or a similar indication in the "owner" field in that list is not evidence of any actual

ownership or legal title over the assets; rather, that "owner" information was simply what was

used by the various financial institutions for their own clerical purposes.  *See* Smith Decl. ¶¶ 13,

16.  Moreover, the mere fact that assets have been blocked pursuant to the SSR and included in

the information provided by OFAC in response to plaintiffs' third-party subpoena does not show

that the assets at issue are *owned* by the Government of Sudan.  Rather, as explained above, the

fact that that the assets are blocked establishes only that the Government of Sudan has some

blockable "property interest" – as that term is broadly defined by OFAC for purposes of the SSR

regime – in the assets.

Indeed, it is likely that parties other than the Sudanese Government will have superior

interests in at least some of the assets that have been blocked under the SSR.  Any determination

of whether particular assets are not immune from execution under TRIA will require the Court to

determine whether the Government of Sudan has a sufficient ownership interest in the assets

such that the assets are – in TRIA's language – assets "of that terrorist party[.]"

Moreover, even if the Court determines that particular assets are, under TRIA, not

immune from execution, such a finding, alone, will not necessarily entitle the Petitioners to the

assets.  TRIA – when applicable – merely lifts the veil of sovereign immunity conferred by the

FSIA and the otherwise applicable prohibition on attachment and execution set forth in the SSR.

*See* 28 U.S.C. § 1609; 31 C.F.R. § 538.202(e); *e.g., Weininger*, 462 F. Supp. 2d at 478.  Once a

determination is made that particular assets are "of that terrorist party" – *i.e.*, the Government of

Sudan – the Court will still need to make a determination of whether the assets are attachable

under Rule 69 of the Federal Rules of Civil Procedure.  *See Weininger*, 462 F. Supp. 2d at 494-

this determination.

10

499 (reviewing blocked bank accounts to determine which "belong to agencies or instrumentalities of Cuba" and thus subject to execution under TRIA, and relying on New York law pursuant to Fed. R. Civ. P. 69); *see also Karaha Bodas Co.*, 313 F.3d at 82 (holding that Fed. R. Civ. P. 69, and its incorporation of state law, governs the attachability of assets that are not immune from execution under the FSIA); *see also Smith v. Federal Reserve Bank of New York*, 346 F.3d 264, 268 (2d Cir. 2003) (discussing application of Fed. R. Civ. P. 69 and state law in context of TRIA); *FG Hemisphere Associates, LLC v. Republique du Congo*, 455 F.3d 575, 596 (5th Cir. 2006 ) ("[T]he § 1610(a) exception to immunity allows the district court to decide whether to grant the application for garnishment or other form of execution against the property of the foreign sovereign; it does not determine whether, under state law pursuant to Rule 69(a), such property is garnishable or otherwise subject to execution.").

In sum, the mere fact that the property at issue here has been blocked pursuant to the SSR and IEEPA – even in the absence of any claimant's objection – does not, without more, establish it as property of the Government of Sudan for purposes of attachability under TRIA, nor does it establish that the Petitioners are entitled to the assets under Rule 69.

B.    Any Assets Not Found Eligible for Execution Remain Blocked Under the Sudan Sanctions, and Must Be Returned to the Banks From Which the Funds Came

Because the funds at issue here are blocked pursuant to IEEPA and the SSR, and indeed must be blocked for TRIA to apply, *see* TRIA § 201(a) ("the blocked assets of that terrorist party . . . shall be subject to execution"), any funds that the Court finds are not attachable by Petitioners necessarily will remain blocked under the SSR.  *See* 31 C.F.R. §§ 538.201(a), 538.202(e).

For the protection of national security interests and the conduct of foreign policy, the

11

current proceeding should not be a forum for litigants – other than the Petitioners – to collaterally attack the blocking orders.  These assets must be returned to the banks that originally blocked them, and OFAC will promptly issue a license to facilitate such transfers by the Court.

Any third party asserting an interest in funds that the Court has not found to be attachable by Petitioners may seek relief only as specified in the SSR.  For example, any third party asserting that the funds were erroneously blocked due to mistaken identity may seek relief directly from OFAC using the administrative procedures set forth at 31 C.F.R. § 501.806. *See* 31 C.F.R. § 538.201(c).  Likewise, any third party seeking the release of properly blocked funds also may apply for an OFAC license pursuant to 31 C.F.R. § 538.500 *et seq*.[8]

## CONCLUSION

For the reasons stated above, the Court may order the release of funds to Petitioners if and only if the Court finds that the requirements of TRIA – including a finding that the funds at issue are "of that terrorist party" – have been met as to those specific funds, and that the funds are attachable by Petitioners under the applicable state law procedures pursuant to Rule 69.  Any funds at issue as to which the Court finds that these two requirements have not been met will remain subject to the Sudanese Sanctions Regulations, and must be transferred, pursuant to an OFAC license that will be promptly provided, back to the banks that had been holding the funds before they were transferred to the Court's registry.

---

[8]  Indeed, recourse to these procedures is far from hypothetical.  For example, the Government of Ethiopia has sought authorization from OFAC for the return to the remitter of certain funds blocked under the SSR.  Pursuant to the July 29 Order, those funds are currently held in the Court's registry.  OFAC presently intends to exercise its authority under the SSR to license the return of the funds to the remitter.  If it does so, the United States intends to promptly determine whether to make a separate filing with the Court requesting release of those funds.

Dated: New York, New York
      November 21, 2008

                            Respectfully submitted,

                            MICHAEL J. GARCIA
                            United States Attorney
                            Attorney for the United States of America

By:    _/s/ John D. Clopper_____
                            DAVID S. JONES
                            JOHN D. CLOPPER
                            Assistant United States Attorneys
                            86 Chambers Street, 3rd Floor
                            New York, New York 10007
                            Telephone: (212) 637-2739/2716