UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| OLIVIA RUX *et al.*, <br><br> Petitioners, <br><br> v. <br><br> ABN AMRO BANK N.V., *et al.*, <br><br> Respondents | 08 Civ. 6588 (AKH) |

**DECLARATION OF JOHN E. SMITH**

I, John E. Smith, pursuant to 28 U.S.C. § 1746, hereby declare:

1. I am the Associate Director of the Office of Program Policy and Implementation in the U.S. Department of the Treasury's ("Treasury's") Office of Foreign Assets Control ("OFAC"), and I have been employed in this capacity since April 2007. My responsibilities include overseeing OFAC's Compliance, Licensing, and Policy Divisions. These divisions are responsible, among other things, for implementing OFAC's asset freeze program and the licensing process by which parties whose assets have been frozen may request the return or release of those assets. Prior to becoming the Associate Director of the Office of Program Policy and Implementation, from 2004 to 2007, I served as an Expert for the United Nations Security Council, monitoring and assessing United Nations sanctions against Al-Qaeda and the Taliban. Prior to that, from 1999 to 2004, I was a trial attorney at the U.S. Department of Justice, in the Federal Programs Branch of the Civil Division. From 1993 to 1994 and from 1995 to 1999, I was an associate at the law firm of Wilmer, Cutler & Pickering, and from 1994 to 1995, I served as a law clerk for The Honorable Anthony J. Scirica of the U.S. Court of Appeals for the Third Circuit.

2.      I am familiar with the mission and operations of OFAC that are under my authority as Associate Director of Program Policy and Implementation, and I make this declaration based upon information within my personal knowledge or provided to me in my official capacity.

OFAC's Mission and Authority

3.      OFAC is the office within Treasury that is principally responsible for administering U.S. economic sanctions programs. These programs are primarily directed against foreign states and nationals, and implement U.S. foreign policy and national security goals. Pursuant to authority delegated by the President to the Secretary of the Treasury, OFAC acts under Presidential national emergency powers, as well as under authority granted by specific legislation, to impose controls on transactions and to freeze, or "block," certain property in which a sanctions target has any interest that is within the United States or in the possession or control of U.S. persons. In performing its function, OFAC relies primarily on its broad delegated powers under the Trading with the Enemy Act ("TWEA"), 50 U.S.C. App. §§ 1-44, and the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701-1706.

4.      OFAC currently administers over 20 economic sanctions programs against foreign governments, entities, and individuals whose activities conflict with U.S. national security and foreign policy interests. For example, OFAC administers sanctions programs relating to Iran, Sudan, Burma, Cuba, Syria, North Korea, Zimbabwe, Belarus, and Cote D'Ivoire. OFAC also implements sanctions programs related to drug trafficking, terrorism, and the proliferation of weapons of mass destruction.

5. As Associate Director of Program Policy and Implementation of OFAC, I am responsible, among other things, for the implementation and administration of the blocking and licensing functions for such economic sanctions programs.

6. Pursuant to IEEPA, in November 1997, the President declared a national emergency with respect to Sudan, finding that the policies and actions of the Government of Sudan ("GOS"), including continued support for international terrorism, ongoing efforts to destabilize neighboring governments, and the prevalence of human rights violations, including slavery and the denial of religious freedom, constituted an unusual and extraordinary threat to the national security and foreign policy of the United States.

Blockings under IEEPA

7. IEEPA grants the President a broad spectrum of powers to deal "with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States, if the President declares a national emergency with respect to such threat." 50 U.S.C. § 1701(a). The President typically exercises these IEEPA powers through Executive Orders that declare a national emergency and impose economic sanctions to address the emergency.

8. IEEPA Executive Orders typically direct the blocking of property and property interests of the sanctions target, which may be a government or an individual or entity, that are within the United States or within the possession or control of U.S. persons, wherever located. In practice, such Executive Orders require holders of such property, including banks, to freeze that property in their possession or control at the time

of the Executive Order, as well as property that later comes into the holders' possession. Blocking actions are not permanent and do not constitute a forfeiture or seizure of assets.

9.      The property and property interests blocked by OFAC pursuant to an Executive Order may not be transferred, withdrawn, exported, paid, or otherwise dealt in without OFAC's prior authorization. OFAC's regulations define "property" to include items such as bank deposits, savings accounts, contracts, book accounts, letters of credit, and other property, real, personal, mixed, tangible or intangible, as well as services of any kind whatsoever. *See, e.g.*, 31 C.F.R. § 537.315 (Burmese Sanctions Regulations); 31 C.F.R. § 538.310 (Sudanese Sanctions Regulations); 31 C.F.R. § 541.308 (Zimbabwe Sanctions Regulations); 31 C.F.R. § 542.308 (Syrian Sanctions Regulations); 31 C.F.R. § 594.309 (Global Terrorism Sanctions Regulations). Under OFAC regulations, a "property interest" includes interests that are "present, future, or contingent," *id.*, and those regulations define the term "interest" broadly to include a property interest "of any nature whatsoever, direct or indirect." *See, e.g.*, 31 C.F.R. § 537.309 (Burmese Sanctions Regulations); 31 C.F.R. § 538.310 (Sudanese Sanctions Regulations); 31 C.F.R. § 541.305 (Zimbabwe Sanctions Regulations); 31 C.F.R. § 542.305 (Syrian Sanctions Regulations); 31 C.F.R. § 594.306 (Global Terrorism Sanctions Regulations). A minor and subordinate property interest of a sanctions target, therefore, can trigger a blocking, even where some other non-sanctioned party has a superior ownership interest in the property. Because of the broad definitions of property and interests in property, OFAC regulations require the blocking of assets far beyond what the sanctions target actually owns. Indeed, much of the property that is blocked pursuant to an OFAC-administered sanctions program would not normally be considered to be owned by the sanctions target.

10. The prohibition against dealing in property and interests in property of a sanctions target serves important objectives. Blocking gives the President the ability to use the blocked assets as a bargaining chip or negotiation tool in resolving the national emergency that gave rise to the blocking and, in some cases, settling U.S. financial claims against the sanctioned entity in an orderly manner consistent with the national interest. For example, the fact that Iranian assets were blocked was instrumental in the release of U.S. hostages in Iran in 1981 and the establishment of a funding mechanism to address U.S. claims against Iran. Blocking also deprives the sanctions target of the benefit of the property that might otherwise be used to further ends that conflict with U.S. interests. A blocking can prevent the sanctioned entity from receiving the economic benefits of transactions with U.S. persons or in the United States market, and limit the flow of hard currency or goods to or for the benefit of that sanctioned entity. Blocking assets of designated terrorists and their supporters prevents those assets' possible use in the orchestration, assistance, or support of unlawful and dangerous global terrorist plots.

11. Because the definitions of "property" and "property interest" are so broad and include, for example, interests "of any nature whatsoever, direct or indirect," *see* 31 C.F.R. § 538.307, and property interests "present, future or contingent," *see* 31 C.F.R. § 538.310, a relatively minor and subordinate property interest of the Government of Sudan can cause an asset to be blocked pursuant to the Sudanese Sanctions Regulations ("SSR"), even where one or more parties unrelated to the Government of Sudan have superior ownership interests in that asset. In this case, for example, a number of wire transfers have been blocked pursuant to the SSR because the Government of Sudan played some role or had some interest, "direct or indirect," "present, future or

contingent," in the property that was the subject of the transactions. *See* 31 C.F.R. §§ 538.307, 538.310.

12. In a typical wire transfer, there are several participants, each of which has, for the purposes of OFAC regulations, a blockable property interest in the funds being transferred. These parties include the remitter (*i.e.*, the party sending the funds), the remitting bank, the beneficiary (*i.e.*, the intended recipient of the funds), the beneficiary bank, and any intermediary banks through which the transfer moves from the remitting bank to the beneficiary bank. If any of these parties is a sanctions target, or the transfer references a sanctions target in the details of the payment instructions, then any U.S. person involved in the transaction (typically as another of these parties) – such as a bank in the U.S. or a foreign branch of a U.S. bank – must freeze the transferred funds and place them in a blocked account. They must then report the blocking to OFAC within ten business days. This reporting provides OFAC with notice and an opportunity to adjudicate the appropriate treatment of the funds.

13. OFAC regulations require that holders of blocked property file an Annual Report of Blocked Property as of June 30 of each year. *See* 31 C.F.R. § 501.603. Among other information, the report must contain the "owner or account party." In OFAC's experience, the owner or account party information that banks report to OFAC does not represent a determination by the holder of who has legal title to the blocked asset. Rather, the information reported as the owner or account party varies, and can include the name of the OFAC sanctions program under which the asset was blocked, the reference in a wire transfer instruction that triggered the blocking (such as the name of a sanctions target or of a bank owned by a sanctions target), or other information used by the

blocking bank for its own clerical or administrative purposes. For example, a bank may report a blocked wire transfer and include as the owner or account party the name of the GOS-owned intermediary bank that triggered the blocking, and not the name of the remitter, remitting bank, beneficiary, beneficiary bank, or any other party with involvement – and an interest – in the transaction.

14. Several recent cases of blocked funds transfers illustrate some of the differences between the broad concept of a "blockable interest" for the purposes of OFAC sanctions programs and the narrower concept of ownership. In two recent situations, funds transfers were blocked because the beneficiaries of the transfers had accounts at banks that are owned or controlled by the GOS. In one of those cases, a government ministry from a third country (*i.e.*, neither the United States nor Sudan) attempted to send a tuition payment for two employees to attend health care training in Sudan. The beneficiary's account was at a bank owned by the GOS, and the transfer was therefore blocked when it was routed through a bank subject to U.S. jurisdiction. In the other situation, a Sudanese national living and working in a third country was attempting to send money to his personal account in Sudan. Again, the beneficiary's account was at a bank owned by the GOS, and a U.S. bank blocked the transfer when it was routed through that bank. On information and belief, OFAC understands that the blocked assets in these two examples are not among those transferred to the Court's registry. OFAC has determined that licenses should be issued in both of these cases to permit the return of the funds to the remitters.

15. In another recent case involving blocked funds, an employee of Sudan's embassy in a third country attempted to send a wire transfer to a person in Japan for the

7

purchase of a personal vehicle. The wire transfer was blocked because the employee provided to the remitting bank his work address at the Sudanese embassy, and the remitting bank then included that information in the wire transfer instructions. An intermediary bank in the United States blocked the transfer because the remitter was an employee of the GOS. On information and belief, OFAC understands that these blocked assets are not among those transferred to the Court's registry. OFAC has determined that a license should be issued authorizing the return of these funds to the remitter.

16. On April 14, 2008, following a third-party subpoena issued by the plaintiffs and a protective order issued by the U.S. District Court for the Eastern District of Virginia, OFAC, through its counsel at the Department of Justice, provided petitioners with a list of accounts containing Sudanese-related blocked assets. The list of accounts included information on the name of the bank holding each account, account numbers, dollar values of the accounts, and "owners," as that term is described in paragraph 13 above. In its cover letter, the Department of Justice stated that "this information is presented as it was reported to OFAC by the blocked asset holders. In particular, we emphasize that . . . the account owner information is as reported to OFAC on Form TDF 90-22.50 by the holders of the respective blocked assets." The letter further noted that "OFAC has made no determination and offers no opinion regarding legal title to the listed assets or whether such assets may be attachable by Plaintiffs."

OFAC Licensing Authority

17. Under most of its sanctions programs (including the Sudan sanctions program), OFAC may use its authority to license certain transactions that otherwise

8

would be prohibited by OFAC regulations, when doing so would further U.S. policy. OFAC licenses are either "specific" or "general." A specific license may be issued when a person individually requests authorization to conduct an otherwise prohibited transaction or service. *See* 31 C.F.R. § 501.801(b). A general license more broadly authorizes certain categories of transactions and is issued publicly. *See* 31 C.F.R. § 501.801. A person who meets the criteria set forth in a general license may undertake activities in reliance on the general license without submitting any request to OFAC.

18. OFAC's licensing division receives, reviews, analyzes, and responds to thousands of requests each year for specific licenses covering a broad range of trade, financial, and travel-related transactions, including those related to the exportation and importation of goods and services and the provision of humanitarian, banking, and financial services.

19. A U.S. person may not engage in a transaction that is prohibited by the relevant sanctions program without a license from OFAC. Because no two sanctions programs are exactly alike, and because applicants often find themselves in unique situations, OFAC considers applications for specific licenses on a case-by-case basis in light of all facts presented. In making licensing determinations, OFAC considers the facts of the case as well as the foreign policy and national security goals of the particular sanctions program. In some circumstances, OFAC may seek foreign policy guidance from the State Department before making its determination.

Pending Sudan-Related Licensing Matters

20. In the normal course of exercising its authorities and implementing U.S. foreign policy, OFAC issues specific licenses authorizing the release of blocked assets. OFAC is currently faced with several license applications in which authorization is sought to release assets blocked pursuant to the SSR. With respect to the assets described in paragraphs 14 and 15, which OFAC believes are not currently held in the Court's registry, OFAC intends to issue licenses for the release of the funds back to the respective non-GOS remitters. With respect to some of the assets that are currently held in the Court's registry, OFAC is aware of two cases in which a determination from OFAC has been sought as to the appropriateness of authorizing release of the blocked wire transfers. In one case, OFAC, based on its delegated authority to administer sanctions and on foreign policy guidance from the State Department, has determined that the issuance of a license to permit the funds to be released to the non-GOS remitter would further the national interests and foreign policy of the United States. In the other case, OFAC continues to consider whether authorization of the release would also be in the U.S. national security and foreign policy interest.

21. In the first case, an Ethiopian entity attempted to transfer funds for the benefit of the Sudanese Petroleum Corporation, a GOS entity, for the purchase of gasoline. The transfer was blocked because the beneficiary was a GOS entity and sanctions target, and OFAC understands that the Ethiopian entity subsequently made payment to the GOS entity by other means. OFAC understands that the blocked funds in this case were transferred to the Court's registry. The Government of Ethiopia has made efforts to obtain authorization for the funds to be returned, and, based on strong foreign

policy guidance from the State Department and its own consideration of the national security and foreign policy interests involved, OFAC intends to provide such authorization.

22. In the second case, a wire transfer from a third country entity to a Sudanese party, for goods imported to the third country from Sudan, was blocked because the bank at which the beneficiary had its account was a GOS-owned bank. We understand that the remitter made payment to the Sudanese party through other means. Again, OFAC understands that the blocked funds in this case were transferred to the Court's registry. Currently, OFAC is considering whether authorization of the return of the funds to the remitter would further the national security and foreign policy of the United States.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: November 21, 2008                     *(signature)* John Smith
                                             John E. Smith