UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

OLIVIA RUX, et. al.,

        Petitioners,

v.

ABN-AMRO BANK, N.V., AMERICAN EXPRESS
BANK, LTD., BANK OF NEW YORK, BANK OF
CHINA, CITIBANK, N.A., DEUTSCHE BANK A.G.,
HSBC BANK USA, N.A, JPMORGAN CHASE
BANK, N.A., BANK OF AMERICA, and FEDERAL
RESERVE BANK OF NEW YORK

        Respondents.

_____/

Case No.: 1:08-cv-06588-AKH
(USDC E.D. Va. No. 2:04cv428)

Re: The Republic of Sudan,
Judgment Debtors

## PETITIONER'S MOTION FOR IMMEDIATE TURNOVER OF FUNDS

The Petitioner moves this Court to enter an Order directing the Clerk to turn over to Petitioners the funds identified below to satisfy the judgment because all conditions for the release of said funds have been satisfied.

## INTRODUCTION

On October 12, 2000, seventeen American sailors perished onboard the U.S.S. Cole in Yemen as the result of an Al Qaeda terrorist attack.. The attack was made possible by the material support and assistance provided by the Republic of Sudan. As a consequence of Sudan's participation in the development of Al Qaeda and its material support leading to this terrorist event, the United States District Court for the Eastern District of Virginia entered a final judgment in favor of the personal representative of the seventeen sailors awarding $12,275,860.00.

To satisfy the judgment, Petitioner filed this special proceeding under CPLR § 5225 against several New York banks and later the Federal Reserve Bank. Because these entities hold

funds belonging to the Republic of Sudan or its agencies and instrumentalities, the identified

funds are subject to attachment and execution under the Terrorism Risk Insurance Act of 2002

("TRIA"). To date, the Petitioner has satisfied every procedural requirement for the turnover of

the attached funds. The Republic of Sudan and all other possibly effected entities have been

properly notified of these proceedings and all potential claimants to the funds have been

similarly notified. No objections have been filed to the turnover of the funds that are the subject

of this motion. As such, the funds should immediately be turned over to the Petitioner to the

extent necessary to satisfy the entire judgment, including interest.[1]

## I. PROCEDURAL BACKGROUND

One year ago, on December 14, 2007, Petitioner served writs of garnishment on the

Respondent Banks to attach assets belonging to Sudan. On January 15, 2008, the Court entered

an Order compelling the parties to meet in order to resolve turnover of the funds. That meeting

proved unsuccessful. The Petitioner filed a turnover petition.

On May 28, 2008, the Court ordered a hearing to establish the procedure to be followed

in the matter. Subsequent to that hearing, the Court entered an Order compelling the

Respondents to deposit with the Court all funds in their possession blocked pursuant to the

Sudanese Sanctions and Regulations (31 C.F.R. § 538.305) held in deposit or wire transfer

accounts with a value in excess of $50,000.00. June 26, 2008 Order attached as Exhibit "A."

The Court also ordered the Petitioner to provide notice to the Republic of Sudan of this

proceeding and for the Respondents to provide notice to any potential claimants of the deposit

accounts or wire transfer accounts at issue.

---

[1] As of the date of this filing, the final judgment inclusive of interest and taxable costs is $13,205,735.00

The Court, in its June 26, 2008 Order as amended, directed the Respondents to file their objections no later than November 21, 2008 and to set forth competent evidence in support of each objection. See Exhibit "A" and Notice to Claimants attached as Exhibit "B." As of the date of this filing and as evidenced by the Respondents' December 2, 2008 letter to the Court, only a small number of objections were filed. There appears to be funds sufficient to satisfy the judgment without taking into account any objected to funds. Because **no** objections to the turnover of the funds identified in this motion have been raised by the government of Sudan or other claimants, this matter is ripe for adjudication. Therefore, execution under the TRIA should proceed and the Clerk should be directed to turn over funds in satisfaction of the judgment forthwith.

## II. MEMORANDUM OF LAW

By this memorandum the Petitioner will establish the following: a.) the TRIA is applicable to the funds held by the Respondents; b.) the Petitioner has satisfied the notice requirements of CLPR § 5225; c.) the entities to whom the funds identified in this motion belong are agencies and instrumentalities of the government of Sudan; and d.) New York's UCC provisions do not bar the Petitioner's attachment of funds held in intermediary banks.

   a.      **Because Sudan is a Terrorist Party under the TRIA, its Blocked Assets and those of its Agencies and Instrumentalities are Subject to Turnover in Satisfaction of the Judgment in this Case.**

Under the TRIA, a terrorist party is a "a terrorist, terrorist organization . . ., or a foreign state designated as a state sponsor of terrorism under section 6(j) of the Export Administration Act of 1979 (50 U.S.C. App. 2405(j)) or section 620A of the Foreign Assistance Act of 1961." 15 U.S.C. § 1610 Note, TRIA § 201(d)(4), 116 Stat. 2332, 2340. (citations omitted). Since 1993, the United States Department of State has designated Sudan as a State Sponsor of Terrorism in

accordance with 6(j) of the Export Administration Act. <u>See</u> Exhibit "C." As such, Sudan is a terrorist party as defined by the TRIA.

"The TRIA was signed into law on November 26, 2002 and was specifically intended to 'deal comprehensively with the problem of enforcement of judgments rendered on behalf of victims of terrorism in any court of competent jurisdiction by enabling them to satisfy such judgments through the attachment of blocked assets of terrorist parties.'" <u>Hill v. Republic of Iraq</u>, 2003 WL 21057173 (D.D.C. 2003), <u>citing</u> 148 Cong. Rec. H8728 (Nov. 13, 2002). The TRIA provides that:

> [I]n every case in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism, or for which a terrorist party is not immune under Section 1605(a)(7) of Title 28, United States Code, **the blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment in aid of execution in order to satisfy such judgment** to the extent of any compensatory damages for which such terrorist party has been adjudged liable.

15 U.S.C. § 1610 Note, TRIA § 201(a), 116 Stat. at 2337 (emphasis added).

The TRIA defines 'blocked asset' as "any asset seized or frozen by the United States under Section 5(b) of the Trading With the Enemy Act (50 U.S.C.App § 5(b)) or under sections 202 and 203 of the International Emergency Powers Act (50 U.S.C. §§ 1701; 1702)." 15 U.S.C. § 1610 Note, TRIA § 201(d)(2), 116 Stat. at 2340. The funds the Petitioner has garnished were frozen under § 5(b) of the International Emergency Powers Act. As such, they are attachable "blocked assets" under the TRIA.

Accordingly, the funds of Sudan and its agencies and instrumentalities that are identified in this motion are subject to turnover under the TRIA in satisfaction of the Petitioner's judgment.

   b.    **Petitioner Has Satisfied Its Obligations under CPLR § 5225 by Providing Sudan with Notice of this Proceeding**

Under CPLR § 5225, a judgment holder may commence a special proceeding against a third-party in possession of a debtor's funds and:

> where it is shown that the judgment debtor is entitled to the possession of such property . . . the court shall require such person to pay the money, or so much of it as is sufficient to satisfy the judgment, to the judgment creditor . . . .

CPLR § 5225(b); see also United Int'l Holdings, Inc. v. The Wharf (Holdings) Ltd., 988 F.Supp. 367 (S.D.N.Y. 1997) (holding to obtain payment of a judgment from a third party in possession of debtor's property, creditor must show (1) that debtor has interest in the property that creditor seeks to attach, and (2) either that debtor is entitled to possession of property, or that creditor's rights are superior to those of the possessing party). The statute also requires notice to be provided to the judgment debtor to allow for possible intervention. See CPLR § 5225(b).

As described above, pursuant to this Court's Order, Petitioner has provided notice of this action to the Republic of Sudan and Respondent Banks have provided proper notice to all potential claimants. All parties and claimants have failed to object to the attachment of the assets identified in this motion. Accordingly, the Petitioner has satisfied its obligation to provide notice under CPLR § 5225.

No further concern need be given to those possible claimants who have not come forward as required by this Court Orders. A claimant, who fails to respond after receiving notice of a CPLR § 5225 action, will be held to be in default. See Phoenician Trading Partners LP v. Iseson, 2004 WL 3152394 (E.D.N.Y 2004); Weininger v. Castro, 462 F.Supp.2d 457 (S.D.N.Y. 2006); LR Credit 10, LLC v. Welsh, 2007 WL 4117605 (N.Y. Civ. Ct. 2007). Once a party has defaulted, all well pleaded factual allegations other than those related to damages are accepted as

true. See Cotton v. Slone, 4 F.3d 176, 181 (2d Cir. 1993); Weininger, 462 F.Supp.2d at 495-96;

Alejandre v. Republic of Cuba, 966 F.Supp. 1239, 1243 (S.D. Fla. 1997) ("Because Cuba has

presented no defense, the Court will accept as true Plaintiffs' uncontroverted factual

allegations."). A petitioner is also entitled to all reasonable inferences arising from his stated

allegations of fact. See Au Bon Pain Corp. v. Artect, Inc., 653 F.2d 61, 65 (2d Cir.1981). If

notice has been provided, in the absence of a contested issue of material fact, the Court may then

enter judgment on the pleadings. Mareny v. Packard Press Corp., 1994 WL 16000129, *5

(S.D.N.Y. 1994).

The Southern District of New York, in Weininger v. Castro, 462 F.Supp.2d 457

(S.D.N.Y. 2006), addressed the issue of whether claimants in default could be found to be

agencies and instrumentalities of a terrorist state under the TRIA. In Weininger, the Court

consolidated two cases filed against the Cuban government on behalf of victims of political

violence. The first victim was shot and killed by Cuban soldiers during the Bay of Pigs Invasion.

The second victim was executed by a Cuban firing squad. Both sued Cuba and others in Florida

Courts under 28 U.S.C. § 1605(a)(7). Default judgments were entered against the Cuban

government and enforcement of the judgments was sought in this Court.

In an effort to collect on the judgments, the Plaintiffs served writs of garnishment on

banks that held blocked funds belonging to agencies and instrumentalities of Cuba. In response

to the writs of garnishment, the Banks sought to interplead the funds. Because the funds were

not held in the name of the Cuban government, this Court addressed whether the blocked assets

belonged to agencies and instrumentalities of Cuba and were subject to turnover under the TRIA.

In its analysis of the Plaintiffs' evidence on Cuba's ownership of the accounts, the Court stated:

> In assessing whether these entities are agencies or instrumentalities
> of Cuba, the Court is 'mindful that the instrumentality and its

related government – not the plaintiff – will frequently possess most of the information needed to [make this determination]. These foreign entities obviously have little incentive to provide information that will help the plaintiff's case, and it may be difficult for the plaintiff to obtain discovery from them.'

Id. at 495 (citations omitted).    Consequently, the Weininger Court held that because the claimants were provided with notice of the proceedings and had not refuted the Plaintiffs' allegations, the claimants were in default.    Therefore, the Plaintiff's allegations were to be accepted as true and were deemed sufficient to establish that the entity was an agency and instrumentality of Cuba.    The Court held:

> In light of [the claimant] having been given notice of this proceeding, the Court credits Plaintiffs' evidence and finds that [the claimant] is an agency or instrumentality of Cuba, and thus that Plaintiffs may execute upon the blocked asset of [the claimant].

Id. at 496.

Just as in Weininger, Sudan and all potential claimants were provided notice of this proceeding and have defaulted by failing to respond and refute their status as agencies and instrumentalities of Sudan.    Accordingly, this Court should follow its decision in Weininger by accepting the Petitioner's pleadings that the entities identified in this motion are agencies and instrumentalities of Sudan and ordering the identified funds to be turned over pursuant to the TRIA.

     c.    **The Entities Identified in this Motion are Agencies and Instrumentalities of the Government of Sudan.**

As described below, the assets the Petitioner seeks to attach are owned by the Government of Sudan or its agencies and instrumentalities.

As defined in Part 538 of the Sudanese Sanctions and Regulations:

The term Government of Sudan includes:

{8331\00099943.1}

7

HALL, LAMB AND HALL, P.A., PENTHOUSE ONE, 2665 S. BAYSHORE DRIVE, MIAMI, FLORIDA 33133 · TEL. (305) 374-5030 · FAX (305) 374-5033

> (1) The state and the Government of Sudan, as well as any political subdivision, agency, or instrumentality thereof, including the Central Bank of Sudan;
> (2) **Any entity owned or controlled by the foregoing;**
> (3) Any person to the extent that such person is, or has been, or to the extent that there is reasonable cause to believe that such person is, or has been, since the effective date, acting or purporting to act directly or indirectly on behalf of any of the foregoing; and
> (4) **Any other person determined by the Director of the Office of Foreign Assets Control to be included within paragraphs (a)(1) through (a)(3) of this section.**

31 C.F.R. § 538.305 (emphasis added). Section 1603 of the Foreign Sovereign Immunities Act ("FSIA") defines an agency or instrumentality as an entity:

> (1) which is a separate legal person, corporate or otherwise, and
> (2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and
> (3) which is neither a citizen of a State of the United States as defined in section 1332(c) and (e) of this title, nor created under the laws of any third country.

28 U.S.C.A. § 1603.

As the following entities fall within the definition of agencies and instrumentalities of the government of Sudan, the following accounts must be turned over immediately to Petitioner to satisfy the outstanding judgment.

### i.    Ministry of Finance

The Ministry of Finance is a division of the government of Sudan and "is the principal competent agency assigned the functions and responsibilities for managing and directing the national economy to achieve its goals and objectives within the federal system of rule and market-oriented economy enshrined in the country's philosophy, strategy and programs." See Exhibit "D."

Despite being notified of these proceedings, the Ministry of Finance has not objected to the turnover of the account. Based upon the analysis in Weininger, supra, a default should be entered against the Ministry of Finance and the following described funds should be turned over forthwith.

Wire account held in the name of Sudan's Ministry of Finance:

| Respondent Bank | Account Name | Account Number | Amount of EFT |
|---|---|---|---|
| Chase | Ministry of Finance | 395513839 | $4,400,423.75 |

ii.    Bank of Sudan

The Bank of Sudan is an agency and instrumentality of the Sudanese government. Executive Order 13067 entered by President Clinton specifically defines the Bank of Sudan as being "owned or controlled by the Government of Sudan."[2] See Exhibit "E." The Bank of Sudan remains on the list of Specially Designated Nationals of Sudan ("SDN list") published by the Office of Foreign Asset Control ("OFAC").[3] See Exhibit "F." The objectives of the bank under the Bank of Sudan Act of 2002 are performing governmental functions such as issuing currency and consulting with the Ministry of Finance and National Economy to issue monetary and financial policies. See Exhibit "G."

The Bank of Sudan is also Sudan's Central Bank. As will be described below, the TRIA expressly stripped a state sponsor of terrorism's immunity from execution on an account of a

---

[2] On December 2, 1997, and pursuant to the International Emergency Economic Powers Act (50 U.S.C. §§ 1701 and 1703), President Clinton signed Executive Order 13067 which designated Sudan as a State Sponsor of Terrorism and froze the assets of Sudan, its agencies and instrumentalities.

[3] The Specially Designated Nationals List is a publication of the Office of Foreign Asset Control, which lists individuals and organizations with whom United States citizens and permanent residents are prohibited from doing business and who's assets are to be blocked.

central bank. This immunity from execution was previously provided under 28 U.S.C.A. §

1611(b) of the Foreign Sovereign Immunities Act ("FSIA"). To accomplish this result, Congress

used language that could hardly be clearer:

> **Notwithstanding any other provision of law,** and except as
> provided in subsection (b), in every case in which a person has
> obtained a judgment against a terrorist party on a claim based upon
> an act of terrorism, or for which a terrorist party is not immune
> under section 1605(a)(7) of title 28, United States Code, **the
> blocked assets of that terrorist party (including the blocked
> assets of any agency or instrumentality of that terrorist party)
> shall be subject to execution or attachment in aid of execution**
> in order to satisfy such judgment to the extent of any compensatory
> damages for which such terrorist party has been adjudged liable.

P.L. 107-297, Title II, § 201(a), Nov. 26, 2002, 116 Stat. 2322 (emphasis added).

The TRIA specified that all assets of a terrorist state "shall be subject to execution or

attachment in aid of execution" in order to satisfy a judgment (including the blocked assets of

any agency or instrumentality of that terrorist [state]. The only exemption that remained after the

TRIA was passed was when there has been a specific determination that an asset should not be

executed against because of our national security interest. 28 U.S.C.A. § 1610(b). That limited

exception does not apply. Section 201 of the TRIA controls over any exemption provided by §

1611 of the FSIA.

Courts have repeatedly held that the phrase "notwithstanding any other provision of law"

(or variations thereof) conveys an unambiguous legislative intent that the new law supersedes all

previous laws. See U.S. v. Fernandez, 887 F. 2d 465 (4th Cir. 1989). Where Congress enacts a

statute declaring that it applies "notwithstanding any other provision of law," Congress is

cognizant of the laws that were previously in effect and a more clear statement of Congress'

intent that the new law supersedes the previous ones "is difficult to imagine." See Crowley

Caribbean Transport, Inc. v. U.S., 865 F. 2d 1281 (D.C. Cir. 1989). Mapoy v. Carroll, 185 F. 3d

224, 229 (4th Cir. 1999) (holding a statute which applies "notwithstanding any other provision of law" means that all other contrary statutes governing that subject are of no effect).

Congress intended to preempt the § 1611 immunity as to central banks of state sponsors of terrorism because an exemption does not exist under the TRIA. Section 1611 came into law before the 1996 amendment to the FSIA created jurisdiction for claims by victims of terrorism against state sponsors of terrorism. The Congressional intent in enacting the central bank exemption under § 1611 was to avoid the discouragement of investment of foreign funds in the U.S. and foreign relations problems if execution were permitted. See Weston Compagnie de Finance et D'Investissement, S.A. v. La Republica Del Ecuador, 823 F. Supp. 1106 (S.D.N.Y. 1993). This policy is inapplicable to state sponsors of terrorism. Their assets are blocked and their investments are frozen.

If the Court were to adopt an opposing view and decide that Petitioner cannot execute against the assets of Sudan's central bank, this Court would be rewriting the language of § 201 to add the central bank's assets to the only exemption permitted under the TRIA. The Court cannot rewrite a law because to do so would violate the plain meaning rule and would vitiate the unambiguous intent of Congress in providing that victims of state sponsors of terrorism can execute against the assets of the state's agencies and instrumentalities, including the central bank. See In re Stoltz, 2002 WL 31845886, *6 (2nd Cir. 2002) (courts must begin statutory interpretation with the understanding that Congress says in a law what it means and means in a law what it says); In re Edelman, 295 F. 3d 171, 177 (2nd Cir. 2002) (where statutory terms are clear the court's inquiry into their meaning is at an end); In re Venture Mortgage Fund, 282 F. 3d 185, 188 (2nd Cir. 2002) ("It is axiomatic that the plain meaning of a statute controls its interpretation, and that judicial review must end at the statute's unambiguous terms"); Connolly

v. Bidermann Industries U.S.A., Inc., 56 F. Supp. 2d 360, 365 (S.D.N.Y. 1999); B.N. Realty Assoc. v. Lichtenstein, 238 B.R. 249, 254 (S.D.N.Y. 1999) (the plain meaning rule presumes that Congressional intent is captured in the language of the statute and that the sole function of the courts is to enforce it according to its terms).

Accordingly, based upon the unambiguous and broad language of § 201 of the TRIA the judgment on the Petitioner's claim against Sudan under the state-sponsored terrorism exception of the FSIA, 28 U.S.C. §1605(a)(7), can be enforced against Sudan's central bank. Any other suggestion must be rejected as a violation of the cardinal rule of statutory construction that statutes must be construed, if at all possible, to give all of their provisions meaning and "operative effect." U.S. v. Nordic Village, 503 U.S. 30, 36 (1992); see also Duncan v. Walker, 533 U.S. 167, 174 (2001) ("It is our duty 'to give effect, if possible, to every clause and word of a statute.'"); Connecticut Nat'l Bank v. Germain, 503 U.S. 249, 253 ("courts should disfavor interpretations of statutes that render language superfluous").

The first case to analyze the relationship between the FSIA and the TRIA was Hill v. Republic of Iraq, 2003 WL 21057173 (D.D.C. 2003). In Hill, Plaintiffs obtained a judgment against the Republic of Iraq resulting from acts of hostage taking and false imprisonment following the Iraqi invasion of Kuwait in 1990. The Plaintiffs sought to satisfy a portion of that judgment from funds held by Riggs Bank, N.A. in the "Embassy of Iraq Commercial Office, Central Bank Account." Id. at fn. 1. Those funds were within the ambit of the Vienna Convention excepting diplomatic funds. In analyzing the Plaintiffs' claim, the Court acknowledged that

> it is conceivable that [the Iraq Embassy Account] might be entitled to immunity under the provisions of the Vienna Convention on Diplomatic Relations, Apr. 18, 1961, 23 U.S.T. 3227, or the FSIA, 28 U.S.C. §§ 1609-1610, **were plaintiffs not proceeding under**

HALL, LAMB AND HALL, P.A., PENTHOUSE ONE, 2665 S. BAYSHORE DRIVE, MIAMI, FLORIDA 33133 • TEL. (305) 374-5030 • FAX (305) 374-5033