UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

OLIVIA RUX *et al.*,

        Petitioners,

        v.

ABN AMRO BANK N.V., *et al.*,

        Respondents.

08 Civ. 6588 (AKH)

ECF CASE

## UNITED STATES' STATEMENT OF INTEREST IN OPPOSITION TO RESPONDENTS' JOINT MOTION FOR AN AWARD OF ATTORNEYS' FEES AND COSTS

LEV L. DASSIN
Acting United States Attorney for the
Southern District of New York
Attorneys for United States of America
86 Chambers Street, 3rd Floor
New York, New York 10007
Tel.: (212) 637-2739/2716

    DAVID S. JONES
    JOHN D. CLOPPER
Assistant United States Attorney
    —Of Counsel—

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ...................................................................................................1

BACKGROUND .............................................................................................................................4

ARGUMENT ...................................................................................................................................7

POINT I – THE SUDANESE SANCTIONS REGULATIONS PROHIBIT THE PAYMENT OF BANKS' FEES AND COSTS FROM BLOCKED ASSETS, AND TRIA DOES NOT AUTHORIZE THE BANKS' REQUEST FOR PAYMENT HERE..........................................................................................................7

    A.   TRIA Does Not Authorize the Banks' Requested Award of Attorney's Fees and Costs From Blocked Assets ..................................................9

POINT II – EVEN IF TRIA PERMITS AN AWARD OF ATTORNEYS' FEES, THE COURT SHOULD DECLINE TO AWARD A PAYOUT OF FEES FROM BLOCKED ASSETS .......................................................................................................15

CONCLUSION..............................................................................................................................17

The United States of America, by and through its attorney, Lev L. Dassin, Acting United States Attorney for the Southern District of New York, respectfully submits this statement of interest in opposition to the respondent banks' joint motion for an award of attorneys' fees and costs, dated March 9, 2009, in connection with the Court's oral rulings in open court on February 19, 2009.[1]  For reasons detailed below, the Court should decline to direct any payment of banks' fees and costs from any blocked funds.

## PRELIMINARY STATEMENT

This case involves various parties' attempts to collect from funds that have been blocked pursuant to Executive Orders 13067 and 13412 and their implementing regulations, the Sudanese Sanctions Regulations ("SSR").  Exercising authorities in, *inter alia*, the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701, *et seq*., the President in Executive Order 13067 declared that Sudan's actions and policies represented an unusual and extraordinary threat to the United States.  E.O. 13067.   As this Court is aware, Executive Orders 13067 and 13412 and the SSR serve vital national security and foreign policy interests by immobilizing assets in which Sudan has an interest, and putting those assets in the hands of the President for use in the conduct of foreign affairs.  The banks' motion for fees and costs is

---

[1] As explained *infra* at 6, at the February 19, 2009 hearing, the Court authorized the award of fees, but specifically left open the possibility that the United States might move for reconsideration as the matter had not been briefed before the hearing.  After the hearing, the respondent banks filed an application styled as a joint motion for fees and costs, notwithstanding that their application had been subject to argument and at least a provisional ruling by the Court authorizing the award of fees.  *See* Memorandum of Law in Support of Respondents' Joint Motion for an Award of Attorneys' Fees and Costs ("Banks' Fee Mem."), filed March 9, 2009 (Dkt. No. 196).  In light of the filing of the banks' joint motion, and because no order awarding fees and costs has yet been entered, we style this submission as a statement of interest in opposition to the banks' March 9 joint motion.  The United States files this statement pursuant to 28 U.S.C. § 517, which provides that "[t]he Solicitor General, or any officer of the Department of Justice, may be sent by the Attorney General to any State or district in the United States to attend to the interests if the United States in a suit pending in a court of the United States. . . ."  28 U.S.C. § 517.

contrary to governing statutes and regulations, finds no support in case law, and contravenes important public policy considerations concerning the conduct of foreign affairs.

Under the SSR, all property and interests in property of the Government of Sudan within the United States or in the possession of a U.S. person are blocked, and may not be transferred, used, or moved without express authorization by the Office of Foreign Assets Control ("OFAC") of the United States Department of the Treasury. Thus, absent clear statutory or OFAC authorization, the blocked assets at issue here may not be paid to any party. *See generally* Statements of Interest of the United States dated November 21, 2008 and January 12, 2009; Letter from Assistant U.S. Attorneys David Jones and John Clopper to the Honorable Alvin K. Hellerstein, dated August 22, 2008.

The petitioners in this case have identified an applicable exception to the SSR's prohibition on dealing in blocked property – the Terrorism Risk Insurance Act of 2002 ("TRIA"), Pub. L. No. 107-297, 116 Stat. 2322 (Nov. 26, 2002), *published as* note to 28 U.S.C. § 1610. As the United States has maintained and this Court has held, TRIA, when applicable, authorizes the use of blocked assets of a terrorist party, notwithstanding the general prohibition of the SSR and other similar regulations applicable in other sanctions programs, for the payment of "compensatory damages" to plaintiffs who have obtained a judgment against the terrorist party on a claim based upon an act of terrorism.

The respondent banks, however, have identified no provision of law that would operate to authorize their requested payment – of more than $620,000 – from blocked funds to defray their fees and costs; nor do the cases they cite or the New York Civil Practice Law & Rules ("CPLR") authorize such relief. And TRIA has no such effect. TRIA's plain terms authorize payment only

to petitioners from blocked assets, and then only in the amount of petitioners' compensatory damage award.

No court known to the United States has granted the relief sought by the respondent banks, under TRIA or otherwise.  The United States takes no position here whether the banks should be compensated for their expenses by charging their costs and fees to petitioners or another source of unblocked funds.  The United States does, however, have a significant interest in ensuring that any award of banks' fees and costs not be made directly from blocked assets, and not, as the banks propose and the Court provisionally directed at the February 19 hearing, be made in addition to a full payment to petitioners of the judgment amount.  Such a payment would directly contravene and undermine the SSR and the Executive Orders underlying the SSR.

The result would be a further loss of assets that are blocked under the Sudanese sanctions program, and a resulting diminution of and intrusion upon the Executive Branch's ability to conduct foreign policy and address the conditions giving rise to the national emergency.  Beyond the immediate financial impact on the sanctions program – which at more than $620,000 is itself significant – the proposed fee award could set a troubling precedent for other applications pursuant to TRIA against blocked funds involving Sudan, Iran, or any other terrorist state; such applications, if granted, would further deplete the pool of blocked funds that currently provides an important source of diplomatic leverage, as well as the pool of assets available under TRIA to other victims of terrorist acts, thereby limiting the effectiveness of a major diplomatic tool and means for compensating victims of terrorism.  Such a result would significantly harm the national interest while doing nothing to further Congress's intent, embodied in TRIA, to create a limited exception by which victims of state-sponsored terrorism could be compensated from the blocked funds of the terrorist state that harmed them.

BACKGROUND

This case's procedural history is fully set forth in prior submissions, including Statements of Interest of the United States dated November 21, 2008, and January 12, 2009, and is only briefly summarized herein, focusing on matters relevant to the respondent banks' eligibility for attorneys' fees and costs.

Petitioners hold a judgment against the Government of Sudan in the amount of their compensatory damages arising from the U.S.S. Cole bombing. They commenced these proceedings by seeking enforcement in Part I of writs of attachment to collect the judgment amount from blocked assets held by the respondent banks. Because there was the potential for third persons to have an interest in the funds, the parties sought to develop procedures that would provide notice of the proceedings to those with a possible interest in the blocked assets at issue, while protecting the respondent banks from various liabilities that could ensue if they improperly released the funds at issue. At a hearing on May 28, 2008, the Court directed the parties to establish procedures governing discovery, notice to potential claimants, a method for receiving objections to plaintiffs' proposed collection and for communicating those objections to the Court, and other procedural matters. *See* Declaration of Sharon L. Schneier, March 9, 2009, at ¶ 8 and Ex. 2 (transcript of May 28, 2008 hearing).

On July 29, 2008, the Court ordered that certain funds be transferred to the Court's registry pending resolution of these proceedings. The Court further required respondent banks to give notice to potential claimants that they had 60 days to submit written objections to petitioners' claims and to assert any interest in the funds at issue. On September 9, 2008, and October 17, 2008, the Court entered orders establishing specific notice requirements.

The Court's July 29 Order specified that "Costs of effecting notice shall be taxed against the ultimate disbursement of the accounts," July 29, 2008 Order at ¶ 5, though the questions addressed herein had not at that time been briefed to the Court. The Order had no provision relating to the respondent banks' legal fees or costs unrelated to providing notice to potential claimants.

Following the receipt of numerous claimant objections, petitioners identified $14,760,916.24 from the funds at issue to which no objection had been received. On December 10, 2008, they filed a "Motion for Immediate Turnover" of those funds. The respondent banks filed responses requesting, among other things, an order discharging them from any possible liability for their release of the funds at issue. In some cases, they also sought compensation for their legal fees and costs. *See* Docket Nos. 175-184.[2] The Court held a hearing on February 19, 2009. At that hearing, petitioners sought full payment of their compensatory judgment, which,

---

[2] In fact, several banks' responses to petitioners' Turnover Motion did not request an award of fees at all, but only requested compensation for costs incurred providing notice, as contemplated by the Court's July 29, 2008 Order. *See, e.g.,* Docket Nos. 177 (response of ABN-AMRO Bank N.V.), 172 (response of HSBC U.S.A., N.A.), 178 (response of American Express Bank Ltd. – Declaration of Barry J. Glickman, ¶ 12), and 173 (response of Citibank (pages unnumbered, at penultimate page)); *but see* Docket Nos. 179 (response of Bank of New York Mellon at 10-11), 182 (response of JPMorgan Chase Bank, N.A., at 12-13), and 175 (response of Deutsche Bank A.G. and Deutsche Bank Trust Company Americas at 9-10).

The banks that sought payment of fees and expenses generally relied on case law governing interpleader actions, *see, e.g.,* Bank of New York response at 10-11 (citing *Septembertide Publ'g, B.V. v. Stein & Day, Inc.*, 884 F.2d 675, 683 (2d Cir. 1989) ("A disinterested stakeholder who asserts interpleader is entitled to be awarded costs and attorney's fees"); *A/S Krediit Pank v. Chase Manhattan Bank*, 303 F.2d 648, 649 (2d Cir. 1962) ("a defendant properly invoking interpleader is entitled to costs and attorneys' fees"), cases that did not involve TRIA. The banks also cited *Weininger v. Castro*, 462 F. Supp. 2d 457, 501-02 (S.D.N.Y. 2006), which authorized a bank that had commenced an interpleader action in connection with a TRIA enforcement proceeding to submit an application for fees and costs. *See, e.g.,* Memorandum of Bank of New York Mellon at 11; Response of Deutsche Bank at 9; Memorandum of JPMorgan Chase at 12-13 (citing *Septembertide, A/S Krediit,* and *Weininger*).

as awarded, included post-judgment interest (a total of approximately $13.395 million), and the respondent banks sought payment of legal fees and costs, in a total amount that they since have quantified as $621,247.22.  *See* Banks' Fee Mem. at 5.

At the February 19 hearing, the Court addressed the respondent banks' requests for fees and costs, and observed, "In the judgment creditor field in New York practice, it's typically the debtor or where the funds are located that absorbs the cost and the judgment creditor takes whole."  Transcript of Hearing, held February 19, 2009, *Rux v. ABN Amro N.V. et al.*, 08 Civ. 6588 (AKH), at 34.[3]  The Court further noted that, under "New York practice," if an amount less than the judgment amount were available from respondents, the funds could be released to petitioners but with some withheld to compensate the banks for their expense, after which the petitioners could seek additional assets until they were compensated in the full judgment amount.  *Id*. at 34-35.  The Court stated, however, that here petitioners "should go first."  *Id.* at 37.  Subsequently, the Court noted that, notwithstanding its ruling, and given the fact that the issue had not been briefed, the Government "can under a motion of reconsideration give me more thought on that.  We can adjust."  *Id*. at 41.

---

[3] A copy of the transcript of the February 19, 2009 hearing is annexed as Exhibit 1 to the Declaration of Sharon Schneier, filed March 9, 2009.

ARGUMENT

POINT I

THE SUDANESE SANCTIONS REGULATIONS PROHIBIT THE PAYMENT OF BANKS' FEES AND COSTS FROM BLOCKED ASSETS, AND TRIA DOES NOT AUTHORIZE THE BANKS' REQUEST FOR PAYMENT HERE

All funds subject to the Turnover Motion are undisputedly blocked funds pursuant to IEEPA, Executive Order 13067, and the SSR. Indeed, if they were not blocked, they could not be subject to turnover under TRIA to any party for any purpose. *See* TRIA § 201(a) ("the *blocked* assets of that terrorist party . . . shall be subject to execution or attachment") (emphasis added). As explained in our prior submissions, the SSR, and, more generally, the President's authority under IEEPA to impose and administer effective blocking and other economic sanctions, are vital tools for national security and foreign relations. The SSR require the blocking of all assets found in the United States or possessed by a United States person in which the Government of Sudan has any interest, and, like other OFAC blocking sanctions, bar any transfer or use of those blocked funds unless licensed by OFAC. *See generally* Statements of Interest of the United States dated November 21, 2008 and January 12, 2009 (discussing SSR); ); *see also, e.g.,* 31 C.F.R. §§500.201(b)(1), 500.203(e) (North Korea); §§ 515.201(b)(1), 515.203(e) (Cuba); §§ 535.201, 535.203(e) (Iran 1979-era asset freeze); § 594.201(a) (global terrorism).

As a general matter, blocked assets may not be transferred, withdrawn, exported, paid, or otherwise dealt in without OFAC's prior authorization. *See* 31 C.F.R. § 538.201(a); *see also* Declaration of John E. Smith, dated November 21, 2008, at ¶ 9 (attached to the United States' November 21, 2008 Statement of Interest); 31 C.F.R. § 500.203(e) (similar provision in North Korea program); § 515.203(e) (Cuba); § 535.203(e) (Iran 1979-era asset freeze); § 594.202(e)

- 7 -

(global terrorism). Moreover, except as specifically authorized by Congress or authorized by OFAC, "any attachment, judgment, decree, lien, execution, garnishment, or other judicial process is null and void with respect to any property or interest in property blocked pursuant to" the SSR. 31 C.F.R. § 538.202(e). Absent an applicable exception to these prohibitions, therefore, the payment of the respondent banks' fees and costs from blocked property is prohibited.

In their joint motion seeking an award of fees and costs, the respondent banks do not address the limitations imposed by IEEPA and the SSR. Instead, they merely cite case law concerning interpleader remedies in cases that do not involve blocked funds, as well as *Weininger v. Castro*, 462 F. Supp. 2d 457 (S.D.N.Y. 2006), which permitted a stakeholder to recover its costs by taxing against the assets being distributed to plaintiffs pursuant to TRIA. *See* Banks' Fee Mem. at 4. The respondent banks have not, however, identified any provision of law that would override the Sudanese sanctions regime to permit the relief they seek. Nor is there any merit to their implicit suggestion that interpleader jurisprudence as derived from state law or the general federal rules and statutes concerning interpleader overrides and essentially preempts the SSR and its underlying presidential directives. Indeed, the Constitution's Supremacy Clause precludes direct application of state law to override the SSR. *See Louisiana Public Serv. Comm'n v. FCC*, 476 U.S. 355, 368 (1986) ("Pre-emption may result not only from action taken by Congress itself; a federal agency acting within the scope of its congressionally delegated authority may preempt state regulation.") (citing *Fidelity Federal Savings & Loan Assn. v. de la Cuesta*, 458 U.S. 141 (1982)).

Meanwhile, any argument that federal common law somehow supersedes the SSR or expands the limited remedy that TRIA expressly provides runs afoul of the rule that an intrusion

- 8 -

on Presidential authority must be accomplished by a clear legislative statement. *See infra* at 12-13 (citing cases). The exception that TRIA creates to the blocking regulations is limited; it authorizes only payment to petitioners (who hold a TRIA-eligible judgment against Sudan), and then only up to the amount of their judgment for compensatory damages. Thus, TRIA provides no authorization for the requested payment of the banks' fees and costs from the blocked funds at issue on top of the payment to petitioners of their compensatory damages. *See* TRIA § 201(a).[4] Accordingly, the Court should reject the proposed payment of banks' fees and costs, both to the extent such a payment would be made from blocked funds, and, in any event, to the extent such a payment would be in addition to the full payment of petitioners' compensatory damages award.[5]

    A.    <u>TRIA Does Not Authorize the Banks' Requested Award of Attorneys' Fees and Costs from Blocked Assets</u>

Under the SSR, all property and interests in property of the Government of Sudan are blocked. *See* 31 C.F.R. § 538.310; *see also id.* § 538.307. TRIA – which is codified as a note to Section 1610 of the Foreign Sovereign Immunities Act (the "FSIA") – creates a limited

---

[4] While TRIA does not authorize the payment of blocked funds directly to stakeholder banks, nothing in TRIA prohibits an order directing plaintiffs to pay some or all of the banks' fees and costs from their recovery. *Weininger* achieved at least this functional result by directing that the plaintiff's recovery there be reduced by the amount of fees and costs to be awarded to the stakeholder, with the stakeholders to be compensated in that amount. 462 F. Supp. 2d at 502-03. The end result – a total payout that seemingly did not exceed the compensatory judgment amount – was consistent with TRIA, though it is difficult to ascertain whether the resulting flow of funds technically complied with TRIA. Any payment of fees and costs resulting in a total payout of blocked funds in excess of the compensatory judgment amount, however, as contemplated by the banks' motion here, would directly contravene the limited exception set forth in TRIA and would not be authorized by law.

[5] The Government takes no position on whether the Court may or should direct that the banks receive payment of fees and costs from the payment to petitioners. It also may be possible for the Court to enter a judgment that fixes an amount of attorneys' fees and costs to which the banks are entitled, but that cannot be paid out of blocked funds in the absence of OFAC authorization, because the SSR prohibits any transfer of blocked funds to satisfy the award.

exception to both the SSR blocking regulation, and to the immunity of a foreign state's assets,[6] permitting certain judgment creditors in specified circumstances to recover from blocked assets of terrorist parties.  In relevant part, TRIA Section 201(a) provides:

> Notwithstanding any other provision of law, . . . in every case in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism, or for which a terrorist party is not immune under section 1605(a)(7) of the title 28, United States Code, the blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment in aid of execution in order to satisfy such judgment to the extent of any compensatory damages for which such terrorist party has been adjudged liable.

TRIA § 201(a).

Nothing in TRIA authorizes the award of attorneys' fees or costs.  Indeed, by its express terms, TRIA provides that the blocked funds "subject to execution or attachment" are available "in order to satisfy such judgment to the extent of any *compensatory damages for which such terrorist party has been adjudged liable*."  TRIA § 201(a) (emphasis added).  The language is clear:  only holders of a "judgment" are entitled to execute or attach assets blocked pursuant to the SSR, "in order to satisfy such judgment," and only to the extent of the judgment-creditor's award of compensatory damages.  *Id*.  There is nothing in the statute's text that authorizes any award of fees or costs to any other person, or beyond the compensatory judgment amount.

The court in *Weininger*, the only TRIA case cited by the respondent banks, ruled consistently with this conclusion, compensating the bank for its costs by taxing those costs against the plaintiff's award.  *See* 462 F. Supp. 2d at 502 (ordering that "judgment be entered in

---

[6] Under the Foreign Sovereign Immunities Act of 1976 (the "FSIA"), 28 U.S.C. §§ 1330, 1602-1611, foreign states' assets in many circumstances are immune from attachment.  This statement does not consider whether, but for the effect of TRIA, the FSIA would independently bar enforcement of petitioners' judgment.  TRIA, if applicable, waives immunity otherwise conferred by the FSIA.

favor of Weininger . . . directing [respondent banks] to turn over [funds in identified accounts] not to exceed in total the sum of [the judgment amounts with interest] . . . less a pro rata share of any reasonable attorneys' fees and costs granted to [respondent banks] on separate application"); *id*. at 503 (ordering stakeholders to turn over an amount in their control up to the judgment amounts, and directing the bank's counsel to submit a fee application to the Court).  Meanwhile, no case law known to the Government has held to the contrary.

The rationale for awarding fees and costs directly from blocked funds, and in excess of the compensatory judgment amount – whatever its merits in cases that do not involve blocked funds – fails to take into account the limitations imposed by the SSR and the narrow exception to those limitations set forth in TRIA.  TRIA simply does not independently authorize payment of fees or costs, or contemplate the making of any payment from blocked funds beyond "satisfy[ing]" petitioners' "judgment to the extent of any compensatory damages."  TRIA § 201(a).

TRIA's authorization to satisfy compensatory portions of judgments held by victims of terrorist acts is tightly circumscribed.  TRIA otherwise leaves intact the Executive's plenary power over blocked assets.  As part of his power over the nation's foreign relations, the President has broad discretion in establishing and administering asset blocking programs.  *See, e.g., United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 320 (1936) (describing "the very delicate, plenary and exclusive power of the President as the sole organ of the federal government in the field of international relations").  These blocking programs serve a number of purposes, but their primary function is to "permit the President to maintain the foreign assets at his disposal for use in negotiating the resolution of a declared national emergency.  The frozen assets serve as a 'bargaining chip' to be used by the President when dealing with a hostile country."  *Dames &*

*Moore v. Regan*, 453 U.S. 654, 673 (1981). Blocking programs are therefore an important and flexible tool of foreign policy.

Courts consistently exhibit great deference to the President's authority and judgment in this area. The Supreme Court has specifically emphasized the breadth of discretion afforded the Executive in establishing and maintaining blocking programs. *See Regan v. Wald*, 468 U.S. 222, 232 n.16 (1984) (noting the "sweeping statutory language" of the Trading with the Enemy Act of 1917 (the predecessor to IEEPA) and characterizing efforts to limit Executive authority as "border[ing] on the frivolous"). The amount of blocked assets is necessarily an important aspect of the Executive's power to use the assets in dealing with foreign countries. Thus, any statute or judicial decision that decreases the amount of assets available to the Executive necessarily results in a concomitant diminution of Executive power.[7]

The application of TRIA, by its own clear terms, is explicitly restricted to petitioners' compensatory judgment award. That should end the matter. In the event that the Court decides that TRIA is ambiguous, however, the statute's restriction of the President's foreign relations power should be construed narrowly. Whenever Congress means to restrict powers assigned to the President, it is required to adopt a clear statement doing so, and the scope of Congress's restriction is confined to its express language. *See, e.g., Armstrong v. Bush*, 924 F.2d 282, 289 (D.C. Cir. 1991). This "clear statement" rule applies to "statutes that significantly alter the balance between Congress and the President." *Id.* One branch should not lightly be deemed to

---

[7] Interpreting TRIA to permit an award of attorneys' fees would not only reduce the President's power to use the blocked assets as leverage, it would also reduce the amount of funds available to other potential holders of judgments against state sponsors of terrorism. This is not an idle concern, given the numerosity of suits against foreign states for participation in terrorist acts. *See, e.g.,* Congressional Research Service, *CRS Report for Congress: Suits Against Terrorist States by Victims of Terrorism*, at 72 (Table A-2) (updated August 8, 2008) (available at http://www.fas.org/sgp/crs/terror/RL31258.pdf).

have sought to intrude on the area normally reserved for another. *Id.*; *see also Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 237 (D.C. Cir. 2003) (holding that amendments to FSIA lacked "clear statement" abrogating Executive agreement barring claims against Iran). Thus, in the absence of a clear textual statement to the contrary, any ambiguity in TRIA's language (and there is none) should be construed to maintain Executive power over foreign relations and national security. In this case, that means construing TRIA to not permit an award of attorneys' fees in addition to an award of petitioners' compensatory damages. *Cf. Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992) (stating that it would require an "express statement" by Congress before assuming it intended courts to review President's actions for abuse of discretion "[o]ut of respect for the separation of powers and the unique constitutional position of the President") (citing *Armstong*); *Smith v. Federal Reserve Bank of New York*, 346 F.3d 264, 271-72 (2d Cir. 2003) (holding that TRIA cannot be read broadly to divest the President's preexisting authority to confiscate foreign blocked assets); *American Jewish Congress v. Dep't of Treasury*, 549 F. Supp. 1270, 1277 (D.D.C. 1982) ("If Congress, in enacting the Survey Act [requiring President to conduct survey of foreign investment in United States], intended to intrude upon the President's power to protect military and state secrets, derived directly from Article II of the Constitution, then clearly the statute and legislative history would be more explicit."), *aff'd*, 713 F.2d 864 (D.C. Cir. 1983).

TRIA does not contain a clear expression of congressional intent to permit an award of attorney's fees or costs from blocked assets, as distinct from, or in addition to, an award of compensatory damages to eligible judgment creditors. To the contrary, the text of the statute is

specifically limited to "compensatory damages."[8] Under the clear statement rule, securing any other form of relief – such as punitive damages, injunctive relief, and attorneys' fees – is therefore not authorized by TRIA. *See Armstrong*, 924 F.2d at 289; *Roeder,* 333 F.3d at 237. And, in the absence of authorization by TRIA, Sections 201-202 of the Sudanese Sanctions Regulations, 31 C.F.R. §§ 201(a), 202(e), continue to bar the award of such fees and costs out of blocked property.

In sum, nothing in TRIA (or any other legislation involving remedies for terrorism victims) suggests any intent by Congress to allow stakeholders such as the respondent banks to invade the President's authority over blocked or seized property of terrorist states. Under TRIA, only a "person [who] has obtained a judgment against a terrorist party" based upon an act of terrorism, or a claim for which the terrorist party is not immune under FSIA § 1605(a)(7), is allowed to collect from blocked assets, and plaintiffs are limited to collecting the compensatory

---

[8] While TRIA's text alone is controlling and precludes the requested award of fees and costs, other legislation concerning remedies for victims of terrorism makes clear that Congress knows how to distinguish among different types of relief, such that its decision in TRIA to authorize only "compensatory damages" was deliberate and should not be expansively read. *See* 28 U.S.C.A. § 1605 note (commonly referred to as the "Flatow Amendment") (creating a civil cause of action against officials, agents, or employees of a state for acts that satisfy the requirements of the FSIA immunity waiver in 28 U.S.C. § 1605(a)(7), and providing for money damages including "*economic damages, solatium, pain, and suffering, and punitive damages*") (emphasis added). Other legislation providing remedies for terrorism victims likewise was narrowly drawn, and made no provision to aid anyone other than terrorism victims themselves. *See* Omnibus Appropriations Act [for fiscal year] 1999, Pub. L. No. 105-277, Div. A. § 101(h), Title I, § 117, 112 Stat. 281-491 ("Section 117") (permitting execution or attachment in aid of execution of a judgment for which a foreign State is not immune under FSIA § 1605(a)(7)); Victims of Trafficking and Violence Protection Act of 2000, Pub. L. No. 106-386, § 2002, 114 Stat. 1464, 1541-1543 (directing the Secretary of the Treasury to pay portions of certain judgments against Cuba and Iran, and providing judgment holders the option to obtain 110% of their compensatory damages award plus interest if they agreed to relinquish rights to punitive damages).

damages portion of their judgment. *See* TRIA § 201(a). Unlike the petitioners, none of the respondent banks has obtained a judgment under FSIA § 1605(a)(7). In short, there is no basis to conclude that Congress – when acting to provide a carefully delineated exception protecting a small class of terrorism victims – also intended to create an ancillary exception to permit banks or other stakeholders to collect fees and costs from additional blocked funds that otherwise would remain available as tools in the Executive's exercise of powers over foreign affairs or as potential sources of compensation to other victims of terrorism.

POINT II

EVEN IF TRIA PERMITS AN AWARD OF ATTORNEYS' FEES, THE
COURT SHOULD DECLINE TO AWARD A PAYOUT OF FEES FROM
BLOCKED ASSETS

In the alternative, if, notwithstanding the views of the United States, the Court concludes that TRIA does authorize the award of attorneys' fees and costs, the Court should exercise its discretion and either (a) decline to award any fees, (b) fix an amount of attorneys' fees and costs to which the banks may be entitled, but that cannot be satisfied at this time from blocked assets without an OFAC license, or (c) order that any awarded fees be taken from – and not in addition to – plaintiffs' judgment.

The award of attorneys' fees and other costs to a disinterested stakeholder in an interpleader action is not a matter of right; rather, "any award [is left to] the sound discretion of the district court." *Travelers Indemnity Co. v. Israel*, 354 F.2d 488, 490 (2d Cir. 1965); *see also Globe Indemnity Co. v. Puget Sound Co.*, 154 F.2d 249, 251 (2d Cir. 1946) ("[T]he imposition of costs in equity [including interpleader] is discretionary."); *Sun Life Assurance Co. v. Sampson*, 556 F.3d 6, 8 (1st Cir. 2009) (stating that "a federal court has discretion to award costs and

counsel fees to the stakeholder in an interpleader action whenever it is fair and equitable to do so") (quoting 7 Wright, Miller & Kane, *Federal Practice and Procedure* § 1719).[9]

While factors typically considered by courts – the presence of a disinterested stakeholder who has "expended time and money participating in a dispute not of his own making and the outcome of which has no impact on him," *Fidelity Brokerage Services, LLC v. Bank of China*, 192 F. Supp. 2d 173, 183 (S.D.N.Y. 2002) – might otherwise favor an award of fees here, these factors are outweighed by important policy concerns that do not arise in typical interpleader cases.  As discussed above, any award of attorney's fees and costs from blocked assets will diminish the blocked assets that are within the control of the Executive to the detriment of the President's ability to conduct foreign relations, and will reduce the assets from which other terrorism victims otherwise might be compensated under TRIA.  As the Supreme Court has stated, blocked assets are "bargaining chip[s]," *Dames & Moore*, 453 U.S. at 673, for the President to use in dealing with foreign countries.  Any reduction of blocked assets therefore reduces the number of chips that the President has in addressing the national emergency that gave rise to the blocking program.  Any award to the banks here also necessarily will diminish the ability of other terrorism victims to secure compensation, by diminishing the pool of blocked Government of Sudan assets.

---

[9] The respondent banks also cite N.Y. C.P.L.R. § 1006(f), which provides, in interpleader cases governed by New York law, that "[t]he court shall impose such terms relating to payment of expenses, costs and disbursements *as may be just* and which may be charged against the subject matter of the action." *Id.* (emphasis added).  Like under federal interpleader law, an award of attorney's fees is discretionary.  *See Merrimack Mutual Fire Insurance Co. v. Moore*, 91 A.D.2d 759, 761 (N.Y. App. Div. 3d Dept. 1982) ("[W]e note that although CPLR 1006(f) authorizes the court in an interpleader action to 'impose such terms relating to payment of expenses, costs and disbursements as may be just . . .," the legislative insertion of the phrase "as may be just" in subdivision (f) effectively makes the court's determination in this regard a discretionary act.").

While the United States is appreciative of the assistance provided by the respondent banks in this proceeding, the President's interests in maintaining the maximum possible amount of leverage in negotiating with hostile countries far outweighs the respondent banks' interest in recovering attorneys' fees and costs. Accordingly, in the event that the Court holds that TRIA permits an award of attorney's fees and costs – which it should not – the Court should either exercise its discretion to decline to make an award, or should make an award that comes solely from non-blocked funds.

## CONCLUSION

For the reasons stated above, the Court should deny the respondent banks' motion for award of fees and costs to be paid from funds blocked pursuant to the SSR.

Dated: New York, New York
       March 31, 2009

                              Respectfully submitted,
                              LEV L. DASSIN
                              Acting United States Attorney
                              Attorney for the United States of America

By:   /s/ John Clopper
       DAVID S. JONES
       JOHN D. CLOPPER
       Assistant United States Attorneys
       86 Chambers Street, 3rd Floor
       New York, New York 10007
       Telephone: (212) 637-2739/2716